[No. C067441. Third Dist. Oct. 25, 2011.]

In re Z.K., a Person Coming Under the Juvenile Court Law.
TEHAMA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v.
L.K., Defendant and Appellant.

## COUNSEL

Monica Vogelmann, under appointment by the Court of Appeal; and Michelle Jarvis for Defendant and Appellant.

William James Murphy, County Counsel, and Sylvia Duran, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**ROBIE, J.**—In many ways, this case represents a mother's worst nightmare come horrifyingly to life. Five years after her husband disappeared with their infant son (Z.K.) from Las Vegas, Nevada, the child's mother (L.K.)—who had returned to her home state of Ohio but had never stopped looking for her son—discovered over the Internet that the child was in Tehama County, California, where her husband had been arrested and the child placed in foster care. The mother (mother) immediately contacted the Tehama County Department of Social Services (the department) to request custody. Presumably because of mother's meager financial circumstances (she was on government aid as she pursued a college degree), she could not arrange for an immediate reunion with the minor, but she clearly expressed that she desperately wanted him back.

Unfortunately, by the time mother managed to locate Z.K., the dependency proceedings had already progressed to the stage of the hearing to select a permanent plan for the child (Welf. & Inst. Code,[1] § 366.26)—which in this case was adoption by the current foster mother. Despite this fact, under the law mother had a constitutional right to custody of her child unless and until someone proved by clear and convincing evidence that giving her custody would be detrimental to the minor. But nobody in Tehama County—not the department, not mother's court-appointed attorney, and not the court—recognized or acknowledged this right. Instead of presuming, as the law required, that placement of Z.K. with mother would be to his benefit and trying to determine if there was clear and convincing evidence showing otherwise, the department—with the complicity of the juvenile court, and with no meaningful opposition from mother's attorney—essentially required mother to prove her fitness to be Z.K.'s custodial parent through multiple home studies and psychological examinations. When mother failed to meet the department's expectations, the department sought—and obtained from the juvenile court—the termination of mother's parental rights, without any proof (let alone proof by clear and convincing evidence) that she had abandoned, abused, or neglected the child or that a return of the child to her custody would be to the child's detriment.

On mother's appeal from the juvenile court's order terminating her parental rights and ordering a permanent plan of adoption for the minor, we agree with mother that by terminating her parental rights without finding it would be detrimental to the minor to be placed in her custody, the juvenile court violated mother's constitutional right to due process of law, which is rooted

---

[1] Further undesignated section references are to the Welfare and Institutions Code.

in her fundamental interest in the care, companionship, and custody of her child. We also agree there was no evidence to support an implied finding of detriment.

In the absence of any evidence of detriment, the juvenile court had a duty—both constitutional and statutory—to place the child in mother's custody. Accordingly, we will reverse and remand with directions to the juvenile court to do so.

## FACTUAL AND PROCEDURAL BACKGROUND

Z.K. was born in July 2004 to mother and her husband, J.K.[2] When the minor was three months old, father and the paternal grandmother forced mother out of the home they were sharing in Las Vegas. When mother returned to visit the minor, she discovered that father and the paternal grandmother had left with Z.K., changed their telephone numbers, and left no forwarding address. Mother stayed in Las Vegas, often living in a tent or homeless shelters, and searched for father and the minor for three to six months. Unable to locate her child, mother eventually returned to her home state of Ohio where her mother and extended family reside. Unknown to mother, father had moved to California with the minor.

On May 4, 2008, three-year-old Z.K. was taken into protective custody after he was found wandering, unsupervised, near a busy roadway in Red Bluff. The paternal grandmother did not call police to report the child missing until almost three hours later. Father was interviewed by police and arrested for possession of methamphetamine. Z.K. was not placed with the paternal grandmother, as requested by father, because she admitted to having smoked methamphetamine two days earlier.

The department filed a section 300 petition on behalf of the minor alleging father had failed to protect the minor, allowing the child to wander unsupervised near a busy roadway. The petition further alleged that, thereafter, father was arrested for possession of methamphetamine. At the time of his arrest, father had broken pieces of a glass methamphetamine pipe and two knives in a nightstand within easy reach of the minor. Mother's whereabouts were unknown. Father told the social worker that mother was " 'in a mental institution in Farmersville, Ohio,' " and that " '[s]he does not want anything to do with [Z.K.]. She left a couple of months after he was born.' "

The juvenile court sustained the allegations in the petition regarding father but dismissed a section 300, subdivision (g) allegation that mother had left

---

[2] Father, J.K., is not a party to this appeal.

the minor without any provision for support. The department instigated a search for mother but did not locate her.[3] Z.K. was declared a dependent child of the court and placed in a foster home. The juvenile court ordered reunification services for father but not for mother, as she had not been located and was possibly institutionalized. (§ 361.5, subds. (b)(1) & (e).)

Father failed to reunify with the minor. He was arrested several times during the reunification period on additional drug-related charges. He was also expecting another child with his girlfriend and had stopped visiting Z.K. Mother had still not been located and the department had stopped looking in August 2008. At the 12-month review hearing on June 11, 2009, the juvenile court terminated reunification services as to both parents and set a section 366.26 hearing for September 8, 2009, for selection of a permanent plan for the child. The "Notice Of Hearing On Selection Of A Permanent Plan" prepared by the department advised that the department was recommending termination of parental rights and implementation of a plan of adoption.

A little more than a week before the September hearing date, the department requested a continuance so that it could serve mother with notice of the section 366.26 hearing by publication in Las Vegas. The court continued the hearing to November 30, 2009, and ordered service by publication. The department did not, however, publish notice in Las Vegas. Instead, having received information that mother was residing in Ohio, a week before the November hearing date the department requested another continuance so that the department could publish notice in Ohio. Accordingly, the juvenile court continued the section 366.26 hearing to February 1, 2010.

Meanwhile, mother and the maternal grandmother had continued to search for Z.K., and the maternal grandmother discovered on the Internet a link to a report indicating father had been arrested and the child found wandering the streets. The maternal grandmother called child protective services in Tehama County and left messages. Someone finally returned her calls on December 1, 2009, and put department personnel in contact with mother, who immediately, both by telephone and in writing (on Dec. 2), explained her circumstances and requested custody of Z.K.

Among other things, mother informed the department that since her return to Ohio, she had attended college to obtain her associate degree as a medical administrative assistant and was scheduled to graduate in only a few weeks. She also planned on continuing her education to obtain a bachelor's degree as a medical administrative specialist. She had reliable transportation, sufficient to get to work and appointments.

---

[3] Although the department filed a declaration of due diligence, which the court accepted, we question whether the department actually conducted a sufficient search for mother.

On December 8, 2009, the department filed a supplemental report with the juvenile court and provided the court with a copy of mother's December 2 letter. At a hearing on December 14, the court appointed legal counsel for mother.

Despite the knowledge of mother's whereabouts, her circumstances, and her request for custody of the minor, on January 27, 2010, the department filed a section 366.26 hearing report in advance of the February 1 hearing recommending termination of the parental rights of both parents and requesting that the permanent plan for the child be adoption by the current foster mother. In the report, the department noted that mother had been in frequent telephone contact with the social worker since December 2, 2009, "wishe[d] to be reunited with her son, . . . and w[ould] do whatever is requested by the Court to achieve that goal." Nowhere in the report did the department address whether returning the child to mother's custody would be detrimental to the child.

At the hearing on February 1, the department submitted another supplemental report that consisted of an e-mail from mother of that same date. In the e-mail, mother pleaded that she "desperately want[ed] to be back in [the child's] life" and stated that she had recently begun taking parenting classes to help her understand how to raise a disabled child. (Z.K. has been diagnosed as mildly mentally retarded.) Father's attorney requested that the matter be set for a contested section 366.26 hearing. When the court proposed a hearing date in early March, mother's attorney informed the court that mother was "on a limited income" and needed additional time to make plans to travel to California for the hearing. The hearing was set for March 24.

On March 4, 2010, the department requested that the court continue the section 366.26 hearing to June, "as recent changes in the mother's circumstances need to be addressed." The department noted that mother was "requesting services and placement of the minor, and an Interstate Compact on the Placement of Children (ICPC) [home study] will need to be done."[4]

At a hearing on March 15, the court continued the matter to June 21 for a resetting of the contested hearing to give the department time to file an amended recommendation.

---

[4] As we explain further hereafter, the ICPC (Interstate Compact on the Placement of Children) is an interstate compact designed "to facilitate the cooperation between states in the placement and monitoring of dependent children." (*Tara S. v. Superior Court* (1993) 13 Cal.App.4th 1834, 1837 [17 Cal.Rptr.2d 315]; see Fam. Code, § 7900 et seq.) Among other things, the ICPC provides that a dependent child subject to the compact's provisions "shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." (Fam. Code, § 7901, art. 3, subd. (d).)

On March 23, 2010, mother and the maternal grandmother came to California from Ohio to visit the minor. (Presumably this visit was in conjunction with the Mar. 24 hearing date, which had since been continued.) Mother participated in several visits over a period of three days, all of which went well. It was concluded that mother had the capacity to develop a maternal relationship with the minor.

The department received the ICPC home study report from the Scioto County Children Services Board in Ohio in April 2010. Mother was found to have no criminal history and no child protective services history. She was living in a small second-floor, one-bedroom apartment where she had lived for over two years. The apartment appeared to be clean and adequately furnished. Mother was planning to move to a three-bedroom apartment as soon as her current landlord finished renovations. Until then, she would have Z.K. sleep in the bedroom and she would sleep on the living room couch. She was unemployed at the time, but actively seeking employment. She was receiving $115 in cash assistance and $200 in food assistance monthly and was using the proceeds from student loans to help pay her $429 in monthly expenses. She had a male friend she identified as Lewis Ruth whom she saw several times a week but who did not reside in her apartment. He could provide child care assistance if needed, as could her mother and relatives.

The ICPC home study was "denied,"[5] however, based on the following concerns: (1) the adequacy of mother's income; (2) the possibility that mother was living with Lewis Ruth (based on the presence of fishing poles, hunting hats, and tools in the home and mother's apparent statement to a caseworker at the Ohio Department of Job and Family Services at an unspecified time that she was living with Ruth); (3) the adequacy of bedding space for Z.K. if Lewis Ruth was, indeed, living in the apartment; and (4) the hazardous condition of the outside wood stairs leading up to the apartment.[6]

At the hearing on June 21, mother's counsel stated that before the matter was set for a contested hearing she needed a report from the department, including the home study. The department's attorney stated she had faxed the study to mother's counsel in May but nonetheless would prepare a report and attach the study to the report. To allow the department time to accomplish this, the court continued the matter to July 6 for resetting.

---

[5] We understand the statement that "[t]he home study is denied" to represent a finding by the children services agency in Ohio that the proposed placement of Z.K. with mother appeared to be contrary to the interests of the child. In this sense, the Ohio agency was essentially denying the request by the California agency to place the child with mother in Ohio pursuant to the ICPC.

[6] The evaluator reported that "[t]he construction of the stairs is poor, with wide gaps between the rails," which "appear to be hazardous to everyone, especially small children."

On June 25, the department filed its "Addendum Report" with the court. In that report, the department noted that mother had been in "at least minimum weekly contact with [the] [s]ocial [w]orker . . . regarding the well-being and care of [Z.K.]" She had also provided the department with "verification of her college degree, and certifications of parenting classes she ha[d] completed in anticipation of [the minor] being placed in her care." Mother had also "researched the community support systems in her area that m[ight] assist [Z.K.], should he be placed in her care."

The department went on to note that the ICPC request had been denied "due in large part to concerns about [mother']s inadequate monthly income, the possibility another unknown person was residing in the home, and the home had only one bedroom." The social worker had discussed with mother on June 21 "her progress in addressing the issues to be corrected," and mother provided the following information: She had obtained full-time employment beginning on June 10. The maternal grandmother was assisting her financially in obtaining larger housing, and she had located housing with additional bedroom space. Contrary to the concerns raised in the ICPC report, mother maintained that she did not have another adult residing in her home. She also indicated she would request another ICPC study be performed once she moved into her new apartment.

The department also reported that, despite father's consistent portrayal of mother as suffering from severe mental health problems and having an extensive mental health history, including hospitalizations for mental illness,[7] the department had found no evidence mother had ever been diagnosed or treated for mental illness.

The report concluded that it was the social worker's opinion that Z.K. be placed with mother if the Ohio agency approved the placement following the ICPC study. (Presumably this was a reference to the second ICPC study mother was going to request, since the first ICPC study had resulted in a denial more than two months earlier.) The department also recommended that family maintenance services should be offered to mother in Ohio.

On July 2, the department requested that the July 6 hearing be continued to August so the social worker could prepare another report. The court granted that request and continued the matter to August 16.

On July 12, the department requested that mother complete a psychological evaluation. Thereafter, on July 22, the department filed another addendum

---

[7] In fact, in addition to maintaining he had no knowledge of the whereabouts of mother or any of her relatives, father had adamantly emphasized that mother was completely unsuitable to have any contact with the minor in any event and warned against even supervised visits in the event she was located.

report. In that report, without any explanation for the change from the report a month earlier, and with no mention of the request for a psychological evaluation, the department once again recommended the termination of the parental rights of both parents and requested that the permanent plan for the child be adoption by the current foster mother.

At the hearing on August 16, the court continued the resetting of the section 366.26 hearing to September.

On September 10, 2010, the department filed a report that indicated it was once again pursuing placement of Z.K. with mother. The department noted that mother had "addresse[d] the issues of her housing and income that were problems raised by the first [ICPC report]" because she had "moved into a two bedroom apartment, obtained full-time employment . . . , and completed a mental health assessment." The department requested a continuance to November "in order to verify the [second] ICPC outcome, and to provide further information to State Adoptions," which was requesting "a full psychological evaluation" and "mental health history" for mother.[8] The department also indicated that it would "be continuing to investigate the validity of [mother]'s claim regarding anyone living in the home" and would "complete a criminal and Child Welfare history background inspection" "[i]f a determination is made that there is someone living in the home." The department concluded that if the second ICPC study approved placement with mother, family maintenance services should be provided to mother "to aid in the transition of [Z.K.] into her care."

The juvenile court continued the matter to November 8, 2010, as requested.

On September 21, 2010, the department sent a request for a second ICPC study to Ohio. On that same date, the department received a mental health assessment of mother completed by an MFT (marriage and family therapist) intern. After receiving this assessment, the department asked mother to complete a psychological evaluation by a psychiatrist.

[8] "State Adoptions" refers to the State Adoptions Branch of the State Department of Social Services, which was involved in the proceeding at this point in anticipation that adoption would be the permanent plan selected for Z.K. at the section 366.26 hearing. That agency, however, had *no* authority to request a psychological examination of mother, and the department had no business backing State Adoptions's request for one, especially in the absence of any evidence of potential psychological issues with mother.

From the comments of the department's attorney at oral argument in this matter, it appears State Adoptions was "heavily invested" in completing the adoption of Z.K. by the foster mother and fought what efforts the department did make to investigate placing the minor in mother's custody instead. Ultimately, however, the department knuckled under to pressure from State Adoptions and went along with the request for a psychological examination to "preserve the relationship" between the two agencies. This—like much the department did in this case—was completely improper.

On October 18, 2010, mother reported to the ICPC evaluator in Ohio that Lewis Ruth was living with her in the home and she needed a couple of weeks to get his background check completed. Thereafter, on November 5, 2010, mother reported to the Ohio ICPC evaluator that Ruth still had not completed his background check and, in addition, she had lost her job. She requested additional time before completion of the second ICPC study to find another job, but the evaluator told her the study needed to be completed within three weeks (i.e., within 60 days of the date of the request for the study).

At the hearing on November 8, mother's attorney told the court that mother's psychological evaluation was not scheduled until November 24. The representative of State Adoptions also informed the court that the second ICPC study had not yet been completed. Accordingly, the matter was continued to December 6.

On November 30, because mother had not contacted the evaluator in Ohio following their contact on November 5, the evaluator closed the home study, denying placement of the child with mother.

On December 6, the contested section 366.26 hearing was set for January 12, 2011. In advance of that hearing, the department filed another addendum report on December 9. In that report, the department once again returned to recommending the termination of the parental rights of both parents and requesting that the permanent plan for the child be adoption by the current foster mother. The department criticized mother for not following through with the second ICPC study, characterizing her as uncooperative. The department also complained that it had not received the full psychological evaluation it had requested and proclaimed the mental health assessment completed by the MFT intern, "uninformative and useless."

At the contested hearing on January 12, mother's attorney stated that mother was "requesting placement as the non-offending parent" and asked for a continuance so that mother could find transportation to attend the hearing. The department's attorney responded that the ICPC study "was denied," and the attorneys for the minor and the foster mother both objected to a continuance. The juvenile court denied the request for a continuance "both for the reasons state[d] by counsel on the record and for the reasons that appear throughout the file which in large part deal with the non-cooperation and the failure to cooperate of the mother, not the least of which is her failure twice in a row to cooperate with the Interstate Compact procedure." Thereafter, mother's attorney examined the social worker, eliciting testimony that mother's visit with the minor in March 2010 was "successful" and that mother did not "follow through" on the second ICPC study because "they needed to make a home visit and that was never completed."

Finding by clear and convincing evidence that the child would be adopted, the juvenile court terminated the parental rights of both parents and selected adoption as the minor's permanent plan. Mother timely appealed.

## DISCUSSION

Mother contends the juvenile court violated her due process rights when the court terminated her parental rights without finding by clear and convincing evidence that placing Z.K. in her custody would be detrimental to the minor. We agree. We also agree that there is no evidence in the record to support an implied finding of detriment. Accordingly, the termination of mother's parental rights must be reversed.

## I

### *Disentitlement*

Initially, we address the department's contention that the disentitlement doctrine applies to bar this appeal because mother failed to complete the second ICPC home study and the requested psychological evaluation before the section 366.26 hearing in January 2011.

A reviewing court has inherent power to dismiss an appeal when the appealing party has refused to comply with the orders of the trial court. (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897 [106 Cal.Rptr.3d 365].) This disentitlement doctrine prevents a party from seeking assistance from the court while that party is in an attitude of contempt to legal orders and processes of the court. (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 272, 277 [89 P.2d 382] [appellant challenged attorney's fees after absconding with the minor children and holding them outside the country].) Appellate disentitlement "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction." (*Puluc-Sique*, at p. 897.) In criminal cases it is often applied when the appellant is a fugitive from justice. (*Ibid.*) In dependency cases, the doctrine has been applied only in cases of the most egregious conduct by the appellant that frustrates the purpose of dependency law and makes it impossible for the court to protect the child or act in the child's best interests. (See *In re Kamelia S.* (2000) 82 Cal.App.4th 1224 [98 Cal.Rptr.2d 816] [father absconded with minor]; *Guardianship of Melissa W.* (2002) 96 Cal.App.4th 1293 [118 Cal.Rptr.2d 42] [grandparents denied placement/guardianship thereafter absconded with minor]; *Adoption of Jacob C.* (1994) 25 Cal.App.4th 617 [30 Cal.Rptr.2d 591] [mother abducted child].)

The conduct of mother on which the department relies to invoke the disentitlement doctrine here is far from the flagrant disobedience and contempt that would justify the sanction of disentitlement. Even if we were to assume mother's conduct related to the incompletion of the second ICPC study and the psychological evaluation were in some manner culpable, that conduct would not constitute contempt at all, as neither the ICPC study nor the psychological evaluation was court ordered. Furthermore, as we discuss hereafter, neither the study nor the evaluation could lawfully be required as a precondition to placing the minor with mother and avoiding the termination of mother's parental rights. There is simply no basis for us to apply the disentitlement doctrine to the facts in this case, and the department's assertions to the contrary are completely unjustified.

## II

### Due Process and the Termination of Parental Rights

In *In re Gladys L.* (2006) 141 Cal.App.4th 845 [46 Cal.Rptr.3d 434], the court noted that "[p]arents have a fundamental interest in the care, companionship, and custody of their children. (*Santosky v. Kramer* (1982) 455 U.S. 745, 758 [71 L.Ed.2d 599, 102 S.Ct. 1388] (*Santosky*).) *Santosky* establishes minimal due process requirements in the context of state dependency proceedings. 'Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.' (*Id.* at pp. 747–748.) 'After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge.' (*Id.* at p. 760.) 'But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.' (*Ibid.*)

"California's dependency system comports with *Santosky*'s requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court *must* have made prior findings that the parent was unfit. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) 'The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.' (*Id.* at p. 256.) The linchpin to the constitutionality of the section 366.26 hearing is that prior determinations ensure 'the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself.' (5 Cal.4th at p. 256.)" (*In re Gladys L., supra,* 141 Cal.App.4th at p. 848.)

California's dependency scheme no longer uses the term " 'parental unfitness,' " but instead requires the juvenile court make a finding that awarding custody of a dependent child to a parent would be detrimental to the child. (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1211 [66 Cal.Rptr.3d 783], citing *In re Dakota H.* (2005) 132 Cal.App.4th 212, 224, fn. 3 [33 Cal.Rptr.3d 337]; accord, *In re Frank R.* (2011) 192 Cal.App.4th 532, 537–538 [121 Cal.Rptr.3d 348].) Due process requires that a finding of detriment be made by clear and convincing evidence before terminating a parent's parental rights. (*In re Frank R.*, at pp. 537–539.) " 'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.' " (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569–1570 [47 Cal.Rptr.3d 281], quoting *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426 [132 Cal.Rptr.2d 907].)

The department tries to discount both *Gladys L.* and *Frank R.*, arguing that "both [of those cases] relied on . . . cases that are factually distinguishable and therefore inapposite to this case." Specifically, the department argues that the underlying cases "dealt with the termination of parental rights of presumed fathers *from whom the children had been removed*, not parents who had never had custody." The department contends that here, because mother's "whereabouts continued to be unknown until after services for . . . both parents were terminated and a [section] 366.26 hearing was already set," "it was literally impossible for the court to make a specific finding of detriment as to [mother] prior to the [section] 366.26 hearing." The department also argues that the "Welfare [and] Institutions Code does not explicitly require a finding of detriment or unfitness for a noncustodial parent at the [section] 366.26 hearing, except for a parent of an Indian child which does not apply here."

The department's arguments are without merit. The fact that section 366.26—a statutory provision—did not require a finding of detriment here is hardly determinative of whether mother's *constitutional* rights were violated by the termination of her parental rights. Furthermore, from a constitutional perspective, it was exactly *because* mother was not involved in the earlier stages of the proceeding that a specific finding of detriment was needed before her rights were terminated at the section 366.26 hearing. As explained above, the only reason the termination of parental rights at a section 366.26 hearing in a typical dependency proceeding is constitutional is because of the findings that have necessarily been made as to the parent at earlier stages of the proceeding. Here, no such findings were made as to mother because her whereabouts were unknown and she was not a subject of the earlier stages. As the department admits, mother "was not the custodial parent, the child was not removed from her custody and she was not denied placement [at the dispositional hearing]." Thus, to terminate *her* parental rights at the section

366.26 hearing over her request for custody, a specific finding of detriment, supported by clear and convincing evidence, had to be made. It was not.

The department contends that we may imply the necessary finding of detriment "if there is substantial evidence in the record to support it." The department contends there is such evidence here. The department is wrong.

■ First, we dismiss the department's contention that, somehow, the fact that reunification services were terminated as to mother "was indicative that the court believed there was detriment." As the department is well aware, the juvenile court terminated reunification services as to both parents in June 2009, *months* before mother's whereabouts were known and therefore before she had the opportunity to appear in the proceeding. The termination of reunification services to a parent who has not been located provides no support whatsoever for an implied finding of detriment.

We find equally absurd the department's argument that an implied finding of detriment is supported by the fact that mother's initial visit with the minor was supervised. The department points to no evidence that *the court* ordered supervision of the visit. Moreover, even if the court had ordered it, the conclusion that the first visit between mother and the five-year-old Z.K., who were separated when the minor was only months old, should be supervised hardly suggests a finding by the court that giving custody to mother after a suitable reunification period would be detrimental to the child.

We also reject any implication that a finding of detriment to the minor could be based on mother's alleged failure to "pass" an ICPC home study under the circumstances here. Contrary to what the juvenile court may have believed, an approved ICPC report was not legally required before placing Z.K. out of state with mother.

■ "The purpose of the ICPC is to facilitate the cooperation between states in the placement and monitoring of dependent children." (*Tara S. v. Superior Court, supra*, 13 Cal.App.4th at p. 1837.) "The ICPC governs conditions for out-of-state 'placement in foster care or as a preliminary to a possible adoption.' (Fam. Code, § 7901, art. 3, subds. (a), (b).)" (*In re John M., supra*, 141 Cal.App.4th at p. 1573.) By its terms, the ICPC is applicable only "to foster care and possible adoption—neither of which would involve natural parents." (*Tara S.*, at p. 1837.) Accordingly, "compliance with the ICPC is not required for placement with an out-of-state parent." (*In re John M.*, at p. 1575; see also *Tara S. v. Superior Court, supra*, 13 Cal.App.4th at pp. 1837–1839; *In re Johnny S.* (1995) 40 Cal.App.4th 969, 977–979 [47 Cal.Rptr.2d 94].) The California courts have consistently so held. (*In re C.B.* (2010) 188 Cal.App.4th 1024, 1032–1033 [116 Cal.Rptr.3d 294].)

While acknowledging the import of these cases, the department argues that pursuant to "a rewrite called the New ICPC Final Draft 2009," which "California has adopted," the ICPC now "requires [an approved home study] when a public agency seeking to retain jurisdiction places a child with an out of state parent." We find nothing, however, to support the department's assertion that California has adopted what the Web site the department cites[9] calls the "New ICPC." To the extent the department relies on rule 5.616(b) of the California Rules of Court to support its assertion that California has adopted the "New ICPC," we note that that rule has not been amended since 2007—two years *before* the rewrite the department seeks to invoke.

Thus, an approved ICPC study was not legally required before placing Z.K. with mother. To the extent the department can be understood to argue that it was entitled to require an approved ICPC study "as a matter of policy" to "verify risk assessment and safety of the child, and to engage the State of Ohio in the oversight of [any] placement" with mother, we do not disagree that the department was entitled to use the ICPC home study process (to the extent the Ohio agency agreed to go along) to gather information for the purposes of determining whether placing the minor with mother would be detrimental. The department cannot, however, use Ohio's denial of placement under the ICPC as a proxy for the constitutionally required finding of detriment supported by clear and convincing evidence. To support the termination of mother's parental rights, the department must point to specific *evidence* from which we can reasonably imply a finding by the juvenile court that it would be detrimental to place the minor with mother.

The department fails to point to any such evidence. To the extent the department argues that mother "fail[ed] to follow through with [her] responsibilities" to Z.K., we disagree that the evidence of mother's actions here was sufficient to support a finding of detriment by clear and convincing evidence. The social worker's testimony at the section 366.26 hearing in January 2011 that "the last time [she] had telephone contact with" mother was "[p]robably October or November of . . . 2010," without more, does not support a finding of detriment. We do not know why there was no contact, and it cannot be reasonably inferred from the lack of contact by itself that the reason for the lack of contact must reflect something about mother that tends to show it would be detrimental to place the child in her custody. Given that the department had the burden of proving detriment, any *lack* of information here has to be held against the department, not against mother.

Likewise, the lack of a psychological evaluation by a psychiatrist that the department and State Adoptions had requested does not support a finding of

---

[9] See <http://www.aphsa.org/Policy/ICPC_rewrite.htm> (as of Oct. 25, 2011).

detriment. As the department itself admitted, there was absolutely no evidence mother had any mental illness or disorder that would affect her ability to parent Z.K. The only such suggestion came from father, who claimed mother suffered from severe mental illness, including hospitalizations—an accusation the department determined there was no evidence to support. Moreover, it must be noted that mother did obtain and provide a psychological assessment by an MFT intern. While the department asserted to the court that that assessment was "uninformative and useless," the department offered no evidence to support this characterization of the document and failed to offer the assessment itself as evidence in the matter. The department's conclusionary characterization of the assessment is not the sort of clear and convincing evidence necessary to support a finding of detriment necessary to terminate parental rights.

As for mother's alleged "failure to correct two ICPCs in order to obtain custody," that is both factually incorrect and, in any event, insufficient to support a finding of detriment. In the first ICPC study, the only concerns raised were that mother's apartment was too small (assuming mother was living with a man, which she denied), her income was too low, the outside stairs were dangerous, and there might be a man living with her (which, again, she denied). Contrary to the department's suggestion, however, mother *did* "correct" these problems. Indeed, in its addendum report to the court on September 10, 2010, the department specifically indicated that it was once again pursuing placement of Z.K. with mother because mother had "addresse[d] the issues of her housing and income that were problems raised by the first [ICPC report]" because she had "moved into a two bedroom apartment, [and] obtained full-time employment."

As for the incomplete second ICPC study, it does not support an implied finding of detriment either. The department asserts that mother "would not allow the state of Ohio to conduct a [second] home study," but the evidence cited does not support that assertion. The Ohio evaluator did not state that mother refused to allow a second home study; rather, she reported that mother wanted to delay the study "to give her a chance to find another job," but the evaluator refused, asserting that the study "had to be completed within 60 days of the day it was received." Thereafter, mother did not call again, and the evaluator closed the study without following up further.

These facts hardly support a finding that mother "would not allow" a second home study. Indeed, given that placement was denied following the first study in part because of mother's income, it is understandable that mother would have been reticent to complete the second study after losing her job but before finding another. Mother had no reason to know that her lack of income could not rightfully be used as a basis for denying her custody

(see *In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212 [72 Cal.Rptr.3d 398]), and every reason to believe that it would. On these facts, mother's failure to call the Ohio evaluator after the evaluator insisted the study had to be completed by November 30 does not support a finding of detriment to the minor, let alone constitute clear and convincing evidence in support of such a finding.

 Moreover, it appears from the evaluator's letter that completion of the study was delayed because mother needed more time to get a background check completed on Lewis Ruth, who now *was* living with her. But the department fails to explain why it was *mother's* responsibility to provide such a background check in the first place. "[I]t is the party opposing placement who has the burden to show by clear and convincing evidence that the child will be harmed if the noncustodial parent is given custody." (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1243 [113 Cal.Rptr.3d 163].) Upon learning that Lewis Ruth was living with mother, it was *the department's* responsibility to provide evidence that that situation would be detrimental to Z.K. if the minor were placed in mother's custody; it was not mother's responsibility to prove the contrary. Thus, mother's "failure" to provide a background check on Ruth does not support a finding of detriment.

Lastly, we reject the department's assertion that mother's failure to file a section 388 petition was an implied concession by mother that placement of Z.K. in her custody would be detrimental.[10] The juvenile court and the department were well aware, since the time mother first contacted the department, that she was seeking placement of the minor with her as the noncustodial parent, and everyone—the department and the court included—proceeded as though the court could place Z.K. with mother at the section 366.26 hearing without regard to whether mother had filed a section 388 petition (a point we will discuss further hereafter). Unlike the father in *In re P.A., supra,* 155 Cal.App.4th at page 1209, upon which the department relies, mother's counsel did not appear and indicate that a section 388 petition was the appropriate method by which to obtain the relief sought and then fail to file such a petition. Instead, everyone here proceeded as if a section 388 petition was unnecessary. Thus, we will not construe the failure of mother's attorney to file one as a concession of detriment.

 In sum, we conclude that due process requires a finding of detriment to the minor, by clear and convincing evidence, before terminating a parent's

---

[10] As we discuss further hereafter, subdivision (a) of section 388 provides that "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

parental rights. Such a finding was not made in this case, nor can one be supported by the evidence in the record. Accordingly, the order terminating mother's parental rights and ordering a permanent plan of adoption for the minor must be reversed. This does not, however, end our analysis.

## III

### *Statutory Right to Placement*

In addition to the due process requirement previously discussed, a proper finding of detriment to the minor is also statutorily required to place a minor with someone other than his noncustodial parent.

■ Section 361.2 establishes the procedures a court must follow for placing a dependent child following removal from the custodial parent pursuant to section 361. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1820 [46 Cal.Rptr.2d 198].) When a court orders removal of a minor under section 361, the court first must determine whether there is a parent who wants to assume custody who was not residing with the minor at the time the events that brought the minor within the provisions of section 300 occurred. (§ 361.2, subd. (a).) "If that parent requests custody, the court *shall* place the child with the parent *unless* it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a), italics added.) The juvenile court must make the detriment finding by clear and convincing evidence. (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 700 [13 Cal.Rptr.3d 198].) Subdivision (c) of section 361.2 requires the juvenile court to "make a finding either in writing or on the record of the basis for its determination . . . ."

Thus, "a nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of the child.'" (*In re Isayah C., supra*, 118 Cal.App.4th at p. 697.) It is not the nonoffending parent's burden to show that she is capable of caring for her child. Rather, it is the party opposing placement who has the burden to show by clear and convincing evidence that the child will be harmed if the nonoffending parent is given custody.

■ Section 361.2 is designed to apply at the disposition phase of the dependency proceeding, when the court first elects to remove the child from the custody of the custodial parent. It does *not*—at least, not in the course of an ordinary dependency case—apply at the 366.26 hearing. The purpose of "[a] hearing pursuant to section 366.26 [is] to select and implement a

permanent plan for the children"; "[t]he court need not continue to consider the issue of reunification at the section 366.26 hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826].) Indeed, at a section 366.26 hearing, "the juvenile court's dispositional options [ordinarily] do not include return to parental custody." (*Marilyn H.*, at p. 310.) The issue of a return to parental custody *can* be raised late in the dependency proceeding, however, by means of a section 388 petition to change, modify, or set aside a previous order based on a change in circumstances or new evidence. (See *Marilyn H.*, at pp. 307–310.)

Here, mother was not located and did not begin participating in the dependency case until nearly a year and one-half after the disposition hearing and until after the section 366.26 hearing had already been continued twice. In the absence of a section 388 petition to modify or set aside the disposition order, there was no legal basis for the court to consider placement of the minor with mother at the section 366.26 hearing. Nevertheless, as we have previously noted, everyone—the department and the court included—proceeded over the course of the year after mother appeared as if that *was* an option the court had. It is far too late in the proceeding for anyone to complain about the lack of a section 388 petition seeking placement of the child with mother pursuant to section 361.2, inasmuch as everyone in the case has, since mother appeared nearly two years ago, proceeded as if such a petition was before the court.[11]

In effect, the issue of placement with mother was before the juvenile court by consent of all the parties—a consent manifested through their failure to argue otherwise or object to the court's consideration of placement with mother on the basis that no section 388 petition requesting such placement

---

[11] Based on this conclusion, we need not address mother's argument in her reply brief that her attorney's failure to file a section 388 petition constituted ineffective assistance of counsel. We do note, however, that there could be no good tactical reason for failing to file such a petition. We likewise express some consternation at the passivity of mother's appointed attorney in pursuing mother's stated goal of obtaining custody of the minor. The record contains no papers filed by mother's attorney, and while we recognize it was the department's burden to prove detriment, and not vice versa, there was no wisdom in the virtual silence by mother's counsel in the face of the very real possibility (which, in fact, became reality) that mother's parental rights would be terminated. Not only did mother's counsel fail to provide virtually any input to the court on mother's behalf, mother's counsel did not even inform the department and the court that detriment to the minor had to be shown by clear and convincing evidence before her client's parental rights could be terminated.

Given the difficulty inherent in mother's protecting her own rights from across the country with limited financial resources, in the event the juvenile court does not terminate its jurisdiction over Z.K. upon placing the minor with mother on remand, the court should consider appointment of a different attorney to represent mother's interests in the proceeding. Mother is entitled to an advocate who will, with skill, ingenuity, and enthusiasm, in fact, advocate for her interests to the fullest extent of the law, and she did not get that with her first appointed counsel.

had been filed. Thus, we face the question not only of whether the juvenile court erred in terminating mother's parental rights (which we have answered already), but also whether the court erred in refusing to place the minor in mother's custody without a finding of detriment. We find the latter error also. Because the juvenile court did not find that placement of the minor with mother would be detrimental to the minor's safety, protection, or physical or emotional well-being and because, as previously discussed, such a finding cannot be supported by the evidence in the record, it was error for the court not to place the minor in mother's custody.

IV

*Conclusion*

In the absence of any evidence that placing the minor in mother's custody would be detrimental to the minor, mother was entitled to custody of her son, and the juvenile court erred in ordering otherwise. Accordingly, we direct the juvenile court to place the minor in mother's custody.

Subdivision (b) of section 361.2 gives the juvenile court three options when it places a dependent child with a nonoffending, noncustodial parent. Specifically, the court can (1) "[o]rder that the parent become legal and physical custodian of the child" and "terminate its jurisdiction over the child" (§ 361.2, subd. (b)(1)); (2) "[o]rder that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months" (*id.*, subd. (b)(2)); or (3) "[o]rder that the parent assume custody subject to the supervision of the juvenile court" (*id.*, subd. (b)(3)). On remand, the juvenile court here shall be entitled to choose among these options in the exercise of its sound discretion.

Under the circumstances of this case, however, where the juvenile court terminated mother's parental rights without making the requisite finding of detriment and without even understanding that such a finding was necessary —despite clear case law to the contrary—we conclude it is in the interests of justice for a different judge to hear the proceeding on remand. Accordingly, on our own motion, we so order. (See Code Civ. Proc., § 170.1, subd. (c).) As previously noted, we also strongly recommend that the court appoint new counsel for mother in the event the court chooses to retain jurisdiction over the minor pursuant to section 361.2, subdivision (b)(2) or (3).

DISPOSITION

The order terminating parental rights and ordering a permanent plan of adoption for the minor is reversed, and the case is remanded to the juvenile

court for further proceedings in accordance with this opinion. The stay of proceedings previously issued by this court is vacated upon the finality of this opinion.

Nicholson, Acting P. J., and Hoch, J., concurred.