Filed 12/10/25  In re A.U. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.U. et al., Persons Coming Under the Juvenile Court Law. | C103449 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N.U.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD000208, JD000209, JD000210, JD000211, JD000212) |

Appellant N.U. (father), father of the five minors, appeals from the juvenile court's disposition.  (Welf. & Inst. Code, §§ 300, 361, 395.)[1]  Father contends there was insufficient evidence to support the juvenile court's finding that there was a substantial

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

risk of detriment to the minors' physical or emotional well-being if placed in his custody. We will affirm the juvenile court's orders.

## I. BACKGROUND

The five minors, A. (two months old), M. (two years old), Ed. (five years old), N. (seven years old), and El. (eight years old) (the minors), came to the attention of the Sacramento County Department of Child, Family, and Adult Services (Department) after it received a referral that mother L.U. (mother) appeared to have untreated mental health and substance abuse issues and was observed yelling at the minors who were "crying all the time" in front of the home. It was further reported that, despite an active restraining order against him (filed by mother in February 2024), father and his girlfriend showed up at mother's residence. On September 18, 2024, law enforcement was called to the home after father and his girlfriend showed up at mother's home and began yelling at mother and the girlfriend threatened to assault mother.

According to a second referral, on September 26, 2024, father reportedly forced his way into mother's residence, punched mother in the face and head, and grabbed minor El.'s leg before she was able to kick him and get away. Minor N. reportedly grabbed a knife in an attempt to protect mother from father.

On September 27, 2024, the social worker interviewed mother and the minors at home. Mother had bruises on her arms and face from father's assault the previous day. She stated she did not contact law enforcement, explaining that father had come to the home with diapers for A. (the baby) and the minors, who were "frantic," allowed him to come inside. Mother reported father had been coming over to demand sexual favors from her in exchange for paying for diapers and bills. She stated that father had come to the residence in January 2024 and beat and raped her, causing her to become pregnant with the youngest minor. She obtained a restraining order against father the following month which was active until June 2025. She claimed father returned in June 2024 and again demanded sex. She reported father had hacked her computer, her phone, and her bank

2

account. Mother claimed she contacted law enforcement often regarding father's violation of the restraining order but nothing was done and law enforcement told her to stop calling.

El., the eldest minor, reported to the social worker that, when father came home on the previous day, she let him inside because he had diapers for the baby. She observed father push, punch, and hit mother in the head. Her brother, N., then came out of the kitchen with a knife and walked towards father. Father walked away and grabbed El.'s leg but El. kicked father and got away. She reported she was afraid of father and did not want to see him.

N. told the social worker that " 'father was insane last night, he hit mom ten times, and I did not like it.' " He also said father was " 'the worst person in life.' " N. stated that prior to the incident on September 26, 2024, he only remembered one time when mother yelled at father. The social worker also interviewed E., who stated, " '[L]ast night dad pulled sister, grabbed her by the leg and arm and was going to hit my sister with a shoe.' " E. also said father hit mother while mother "was holding the baby and hit her sister."

On September 28, 2024, the Department received a third referral from law enforcement that the minors were being placed into protective custody due to an incident at an AT&T store during which mother acted erratically, accusing the store employee of sleeping with her husband. Mother had previously accused a Starbucks employee of sleeping with her husband, and she claimed father " 'slaps the girls across the face' " and molested minor El. Mother was placed on a section 5150 hold for a mental health evaluation and transported to the hospital where she tested positive for methamphetamine. When it was learned mother had been breastfeeding after having ingested methamphetamine, the baby was sent to the hospital, where she was diagnosed with amphetamine poisoning. El. had a handprint on her face and her lip was swollen. She told the responding officer that father hit her in the face several days prior. The

Department was informed that mother had sole legal and physical custody of the minors, but the minors could not be released to father due to the active restraining order against him. Thereafter, the minors were placed into protective custody.

The minors were temporarily placed with mother's friend in San Luis Obispo County. When mother failed to participate in an intensive outpatient treatment program as directed, the minors were moved to foster placements (the baby and N. were placed together in one foster home, and Ed., M., and El. were placed together in another).

On October 1, 2024, the social worker spoke with father, who stated he and mother separated in February 2024. Father acknowledged he had an issue with alcohol and said he entered a residential treatment program for 30 days and was currently residing in a clean and sober living program through the Salvation Army. That program required him to attend weekly AA meetings and be drug- and alcohol-free. Father admitted he repeatedly violated the restraining order, noting mother would call him to watch the minors when she worked or to bring diapers or pay bills. He also went to mother's home because he missed his children. Father admitted that, when he went to mother's home on September 27, 2024, he and mother argued and then he "lost it." He claimed mother was "having psychosis" and had accused him of having a girlfriend and another family.

As of November 8, 2024, mother had been offered but had not engaged in any substance abuse or domestic violence treatment and had demonstrated an unwillingness to put the needs and the welfare of the minors before her own, causing the Department to have concern that the minors were at substantial risk of suffering serious physical harm, abuse, or neglect. The Department filed dependency petitions on behalf of each of the five minors pursuant to section 300. The petitions alleged failure to protect due to the parents' history of domestic violence in the minors' presence, mother's untreated substance abuse problems, and father's untreated anger management issues. (§ 300, subd. (b).) The petition filed on behalf of the baby also alleged serious physical harm

4

inflicted nonaccidentally by mother when breastfeeding after ingesting methamphetamine, causing the baby to suffer from amphetamine poisoning. (§ 300, subd. (a).)

The juvenile court ordered the minors detained, with provisionary services and twice weekly supervised visits with father. The court also ordered the Department to begin the Interstate Compact on the Placement of Children process for possible placement of the minors with a relative in Tennessee.

The social worker interviewed father on November 20, 2024. Father denied anger management issues claiming he was rarely angry and only verbally escalated the situation when he was drinking, which he claimed not to have done in the past seven months while living in the Salvation Army's sober living environment. The social worker also met with the minors. The two eldest minors, N. and El., described incidents of domestic violence between mother and father, including recent incidents of father hitting mother and punching mother in the face. Both minors also described themselves trying to intervene to protect mother.

In December 2024, the Department reported that father had not addressed his anger issues and both he and mother had shown they were unwilling or unable to follow the court's orders or the Department's directives in that they were continually violating the restraining order put in place to protect the minors. Father continued to minimize and deny the well-documented domestic violence between him and mother and had not taken steps to address his anger management and domestic violence issues.

In January 2025, the Department reported there was a substantial danger to the minors' physical safety, protection, or physical or emotional well-being if they remained in mother's custody because her circumstances had not changed since detention. With respect to possible placement with father, the Department reached the same conclusion— there was a substantial danger to the minors' physical safety, protection, or physical or emotional well-being if placed with him. At the time the petitions were filed, father was

5

a non-custodial parent due to the restraining order, he minimized or denied the well-documented incidents of domestic violence perpetrated on mother, he repeatedly violated the court's restraining order and engaged in domestic violence with mother in the presence of the minors, and he failed to take steps to address his ongoing anger management and domestic violence issues. It was also noted that father knew, or reasonably should have known, about mother's substance abuse and mental health issues and failed to intervene to protect the minors.

On the other hand, the Department reported that father had begun to actively participate in some services and was engaged in regular visitation with the minors. He had relationships with all of the minors and expressed a desire to address whatever the Department deemed necessary to get the minors back in his care. Father acknowledged his volatile history and was willing to accept support to assist him with learning new behaviors to keep the minors safe. Thus, the Department determined it was in the minors' best interest to offer father reunification services pursuant to section 361.5, subdivision (c), including anger management, substance abuse treatment and testing, parenting education, and counseling.

In February 2025, the Department reported father completed 90 days of alcohol and drug testing, spent one month in a Salvation Army detox and residential treatment program, transitioned to a partial hospital program, and was participating in outpatient treatment. Father was engaged in parenting, anger management, and domestic violence classes and individual counseling.

At the contested jurisdiction and disposition hearing on March 21, 2025, Samara Brown, program supervisor at the Salvation Army's two-year transitional living program, testified father was accepted into and entered the program the previous day. Brown testified the program offered participants a small apartment with an assigned social worker. Services included childcare and an after-school program, food, and a stabilization plan, as well as monthly random drug and alcohol tests. In extenuating

circumstances, such as families in reunification, participants were allowed to have additional support from a designated family member. Father requested the paternal grandmother be allowed to come in to help him with the five minors through the transition period.

Azhya Jones, court investigator, testified that father completed his domestic violence and anger management programs and his 90-day drug and alcohol testing but had only recently started engaging in individual counseling and still needed to complete the parenting class. Father's visits with the minors reportedly went well but had not progressed to unsupervised because the social worker and the visitation supervisor had concerns about whether father could manage all five minors at once, as someone still needed to hold the baby during supervised visits and minor N. had a history of "run[ning] off." Jones testified the goal was to get father engaged in PC cares (parent-child care) before transitioning him to unsupervised visits. Jones further testified that because father completed his drug and alcohol testing in the Salvation Army program and would continue to be randomly tested in the new program, it was not likely his past issues with alcohol posed a substantial risk to the minors.

Investigator Jones testified that father was reportedly employed but currently off work due to an injury. When he was working, father's work schedule was not consistent and sometimes required him to work late at night. There was also a concern that, at the time of the child family team meeting in February 2025, father was interacting with mother by telephone despite the restraining order.

Investigator Jones further testified that her opinion, as set forth in the jurisdiction and disposition report, that placement of the minors with father would be detrimental in part because he minimized and denied the domestic violence was based on her interview with father in November 2024. At that time, father had not engaged in any services and did not want to "discuss the extent of what was going on." Jones confirmed that father

had not denied or minimized the past domestic violence incidents since completing his services.

Father testified he finished the domestic violence counseling two weeks prior to the instant hearing and finished his anger management counseling two weeks before that and had not been referred to any additional domestic violence or anger management services. He last drug tested the day before the hearing when he completed the intake for the Salvation Army program. He was living in a fully furnished two-bedroom apartment with two bunkbeds and a crib. He became employed approximately one month prior to the hearing and generally worked from 6:00 a.m. until either 2:30 or 4:30 p.m. He testified that, if the minors were placed with him, he would find someone to assist in getting the minors off to school or adjust his schedule accordingly. He also confirmed the paternal grandmother could potentially travel from Tennessee to provide support for him for approximately one month.

Father admitted he struck mother and was physically violent with her. In his domestic violence and anger management counseling, he learned strategies and techniques to help recognize and avoid potentially volatile situations and handle his anger. He testified about the specific tools he could put into practice if faced with a violent situation, including recognizing the signs or "red flags," establishing boundaries, and removing things that aggravate the situation such as drinking. Father testified he had no plans to resume his relationship with mother and stated he only had brief contact with her regarding the minors and things like finances, medical care, insurance, and car payments.

Father testified he lived with the four oldest minors their entire lives until the filing of the restraining order, and he never had problems managing them altogether. He did not feel he would have problems managing all five minors because he was willing to change his schedule, adjust his lifestyle, change his job or his career path, take time off, or do whatever else was necessary. He testified that placement of the minors with him

8

would be different than visits because visits were late (ending at 7:15 p.m.), everybody was tired and not where they wanted to be, and the minors got bored, whereas at home they would have a nightly routine.

The juvenile court acknowledged father's progress since the detention hearing in November 2024, noting he completed anger management and domestic violence counseling and took steps to address any alcohol or substance abuse issues. The court expressed its concern, however, that father had not had to care for the five minors on his own other than in a supervised visitation setting and stated, "there's more work to be done from a parenting standpoint." The court sustained the petition, adjudged the minors dependents, and adopted the Department's recommended findings and orders, including that there was a substantial danger to the minors' physical health, safety, protection or physical or emotional well-being if returned to the parents and there were no reasonable means by which the minors' physical or emotional health could be protected without removing the minors from the physical custody of the parents. Father timely appealed the juvenile court's judgment.

## II.  DISCUSSION

Father claims the disposition order is not supported by sufficient evidence that placing the minors with him would be detrimental to the minors' safety, protection, or physical or emotional well-being. The claim lacks merit.

Section 361.2 establishes that, where a noncustodial[2] parent requests custody of a minor following removal from the custodial parent pursuant to section 361, " 'the court

---

[2] Some courts have held that section 361.2 applies only to a nonoffending parent. (See *In re A.A.* (2012) 203 Cal.App.4th 597, 606-608.) Other courts have held that section 361.2, subdivision (a), applies even when, as here, a noncustodial parent's conduct is a basis for dependency jurisdiction. (See *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 301.) The parties and juvenile court here proceeded by applying section 361.2 to father's request for custody, and neither party contends this was error. Because the juvenile court *did* consider father's request under section 361.2 and we conclude, as we explain herein,

9

*shall* place the child with the parent *unless* it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child' (§ 361.2, subd. (a))." (*In re Z.K.* (2011) 201 Cal.App.4th 51, 70.) "The juvenile court must make the detriment finding by clear and convincing evidence." (*Ibid.*)

When reviewing a juvenile court's placement order, we review the record in the light most favorable to the juvenile court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that the minor would suffer detriment. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426; see also *In re A.C.* (2020) 54 Cal.App.5th 38, 43.)

Here, father was the minors' non-custodial parent and he requested custody of the minors following removal from mother. Thus, the Department had the burden to show that placement with father would be detrimental to the safety, protection, or physical or emotional well-being of the minors. (§ 361.2, subd. (a).) The four eldest minors had not been in father's care or custody since the filing of the restraining order in February 2024, and father never lived with the baby who was born thereafter. The minors had witnessed father's domestic violence against mother which prompted the two eldest minors to try to protect mother (with one using a knife) and left them angry at and afraid of father. Once supervised visits began, the minors warmed up to father and the visits reportedly went well, but father had not progressed to observed or unsupervised visits due to ongoing concerns that he was not yet able to manage all five minors, particularly given that minor N. had a history of eloping or "run[ning] off," and minor A. was a baby who needed to be held during visits.

---

that the juvenile court's finding of detriment is supported by the evidence, we need not address this split in authority.

Father admitted he repeatedly violated the restraining order but, for the first several months of the dependency proceedings, he minimized or denied altogether the allegations of anger management issues and the well-documented incidents of domestic violence perpetrated against mother. He completed 90 days of alcohol and drug testing and was continuing to randomly test. He eventually completed domestic violence and anger management counseling in the month prior to the jurisdiction and disposition hearing and finally admitted at the hearing that he had been physically violent with mother. But, he had yet to complete a parenting program despite having signed up sometime prior to January 21, 2025, and had just been accepted into the transitional living program the day before the hearing.

Father claims his openness to correcting his life and his progress in services critically undermine the juvenile court's detriment finding. He argues he completed his 90-day drug and alcohol testing, his substance abuse treatment program, and his domestic violence and anger management services; he was living in a sober living environment, and he had just signed an agreement to participate in the transitional living program which provided him with housing and support services; and he was willing to participate in parenting education. We are not persuaded these steps definitely eliminated the risks to the minors of placement with father.

As the juvenile court stated in making its detriment finding, while father made significant progress in services, there was "more work to be done from a parenting standpoint." The court expressed its concern that father had yet to participate in parenting education and had "not had individual care [*sic*] in a parental role, other than supervised visitation with all five children," who had been out of father's care since February 2024 and who were witness to father's domestic violence against mother, causing the older minors to be frightened of him.

11

On this record, we find there was sufficient evidence to support the juvenile court's finding that placing the minors with father would be detrimental to the minors' safety, protection, or physical or emotional well-being.

## III.  DISPOSITION

The juvenile court's orders are affirmed.

/S/

_____
RENNER, Acting P. J.

We concur:

/S/

_____
MESIWALA, J.

/S/

_____
FEINBERG, J.