Filed 6/6/13  In re Carmelo M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re CARMELO M., a Person Coming Under the Juvenile Court Law. | D063162 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J518491B) |
| Plaintiff and Respondent, | |
| v. | |
| CARL M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David B. Oberholzer, Judge.  Affirmed.

Michele Ann Cella for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Carl M. appeals following the dispositional hearing in the juvenile dependency case of his son, Carmelo M.  Carl contends that there is no substantial evidence to support the finding that Carmelo would suffer detriment if he were placed with Carl.  Carl also contends that the juvenile court failed to issue an order to ensure that he was provided regular and consistent visitation.  We reject Carl's contentions and affirm the juvenile court's judgment.

BACKGROUND

Carmelo tested positive for marijuana at his birth in October 2011.  Carl was aware of the positive test.  On August 13, 2012, 10-month-old Carmelo was found in Carl's car with a friend of Carmelo's mother, C.E.  The friend was smoking methamphetamine, and police found methamphetamine and a methamphetamine pipe in the car.  Carmelo was detained at Polinsky Children's Center (Polinsky), where he tested positive for methamphetamine and marijuana.  Carmelo had a healing second degree burn on his arm.  C.E. said that the burn had been caused by a curling iron, and admitted that she had not sought medical attention for Carmelo.  Carl acknowledged that he was aware of the burn.  He said that he had "brought [Carmelo] Neosporin" but had not taken him to the hospital.

On August 14, 2012, social worker Thomas Ruff went to the home of a paternal aunt in search of Carl.  The paternal aunt said that Carl did not live with her but that he "sometimes use[d] her address."  The paternal aunt telephoned Carl, who agreed to meet Ruff that afternoon.

2

During the afternoon meeting, Carl told Ruff that he was going to sign a lease for a condominium that day, but did not give Ruff the address. Carl denied knowing about C.E.'s drug use. Carl said that he had a medical marijuana card and that he used marijuana occasionally for back spasms. Ruff told Carl that it would be better if he stopped using marijuana. Carl submitted to a drug test after the meeting. The test was positive for marijuana.

On August 15, 2012, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition for 10-month-old Carmelo. The petition alleged that C.E. used marijuana and methamphetamine to excess and that Carl had failed and had been unable to protect and supervise Carmelo. At the detention hearing on August 16, the court found that Carl was Carmelo's presumed father, ordered unsupervised visitation at Polinsky and gave the Agency discretion to detain Carmelo with Carl. Carl visited once during the 10 days Carmelo was detained at Polinsky.

Ruff wanted "to place . . . Carmelo with [Carl] pending a second drug test to confirm no current use and pending a home visit where [Carl] is living." On August 23, 2012, Ruff asked Carl to disclose his address and to drug test again. Carl refused both requests. On August 24, Carmelo was moved to the home of a maternal cousin, where Carl visited Carmelo once. In September, Carmelo was moved to the home of a different maternal cousin, D.H. Carl visited Carmelo in D.H.'s home once that month. Carl never visited again, even on Carmelo's birthday, and never called D.H. to inquire about Carmelo's welfare. Carl ignored Ruff's attempts to contact him.

3

On October 11, 2012, the paternal aunt told Ruff that Carl kept his belongings at her home and that he sometimes slept there. Despite previously having told Ruff that Carl did not live at her residence, she said that she would testify that he lived there. At a hearing that day, Carl said that he was living in the paternal aunt's home and that he had lived there for a couple of months. The court ordered Carl to drug test that day. Carl tested positive for marijuana. The test results indicated recent use, since by this time, the marijuana reflected in the prior test "should be out of [Carl's] system."

The jurisdictional and dispositional hearing began on October 19, 2012. Carl's counsel asked the court to order paternity testing and to continue the dispositional hearing for three-weeks. Counsel informed the court that Carl would request placement if the paternity test was positive. The court denied the request for a continuance and ordered paternity testing.

Carl testified that he had given Ruff an address where he could be contacted, but explained that he had hesitated to provide his residence address because he did not have a stable home. Carl testified that he was living with the paternal aunt during the week and with his daughter's mother, Monica L., on weekends. Carl stayed in the garage at the paternal aunt's home and did not have a room there. Carl initially testified that if Carmelo were placed with him that day, Carl would take Carmelo to the paternal aunt's home or to Monica's home. However, Carl later testified that he would be living with the paternal aunt. He said that he was willing to allow the Agency to inspect the paternal aunt's home that day. Monica required that a paternity test be conducted before she

4

would agree to allow the Agency to inspect her home. Carl did not have a bed for Carmelo, but said that he would purchase one that day.

Carl testified that he had last used medical marijuana three weeks to one month earlier. He was working with a doctor to identify alternative muscle relaxers and painkillers. Carl did not believe that marijuana affected his parenting ability, but said that he had never used medical marijuana while caring for Carmelo. Carl said that if Carmelo were returned to him, he would stop using marijuana.

The court made a true finding on the petition. Carl's counsel asked the court to order Carmelo placed with Carl. The court found that it would be appropriate to place Carmelo with Carl, pursuant to Welfare and Institutions Code[1] section 361.2, but that Carmelo could not be placed with Carl until Carl decided where he was going to live and until it could be determined that his home was safe and appropriate. The court declared Carmelo a dependent and ordered that he be removed from C.E.'s custody (§ 361, subd. (c)(1)) and detained with a relative. Carl's counsel asked the court to order that Carmelo's caregiver allow Carl at least two visits each week. The court did not expressly address this request, but stated that Carmelo needed "frequent and continuing visits." The court continued the hearing for a determination of the appropriate placement.

On October 29, 2012, Ruff left a voicemail message for Carl asking which home he wished to have evaluated. On October 30, Ruff sent a certified letter to each of Carl's two addresses, asking Carl to call him. On October 30 and 31, Ruff called Carl. On both

---

[1] All further statutory references are to the Welfare and Institutions Code.

days, Carl's voice mailbox was full. On November 2, Ruff left another voicemail message for Carl. That day, Ruff went to the paternal aunt's home, but the paternal aunt would not allow Ruff to enter. The paternal aunt said that Carl "sleeps in the garage sometimes [but] doesn't always stay here," and that if Carmelo "had to come here we would make room." Ruff asked the paternal aunt to have Carl call him, and the paternal aunt relayed the message to Carl. On November 5, Ruff left another voicemail message for Carl. On November 8, the Agency received the paternity test results, which showed a 99.99 percent probability that Carl was Carmelo's biological father.

By the time of the continued dispositional hearing on November 13, 2012, Carl had not responded to any of Ruff's messages or letters. Carl testified that if 13-month-old Carmelo were placed with him that day, they would live with his daughter's mother, Monica L.. Carl admitted that he had not allowed the Agency to assess his home for placement. Carl testified that he had the money to buy a bed for Carmelo, but that he was still trying to decide what kind of bed to buy. Carl explained that he had not visited Carmelo because Carl sometimes worked outside of San Diego County. Carl testified that he had visited with Carmelo via Skype about six or seven times since October 19. However, maternal cousin D.H., in whose home Carmelo was placed, testified that Carl had never Skyped with Carmelo since Carmelo had been in her care. Ruff confirmed that D.H. did not have Skyping capability in her home.

The court found that Carl was a non-offending, noncustodial parent and declined to order that Carmelo be placed with Carl. The court found by clear and convincing evidence that Carl was a stranger to Carmelo and that Carmelo was bonded with D.H.,

6

and that it would therefore be detrimental to Carmelo to remove him from D.H.'s home and place him with Carl. The court noted that the Agency had worked toward placing Carmelo with Carl, but that Carl had provided no information about his home, had not made an emotional commitment to Carmelo, had not visited or taken care of Carmelo, and had not maintained their bond. The court ordered that Carmelo remain in his relative placement.

## DISCUSSION

The Agency asserts that "the doctrine of disentitlement should be applied to [Carl]'s claims" because he refused to provide his home address and give the Agency access to the home, thus "prevent[ing] the court from determining whether Carmelo could be safely placed with [Carl]." "Under the disentitlement doctrine, a reviewing court has the inherent discretionary power to dismiss an appeal when the appellant has refused to comply with trial court orders. The doctrine thus 'prevents a party from seeking assistance from the court while that party is in an attitude of contempt to legal orders and processes of the court' and 'may be applied when the balance of equitable concerns make it a proper sanction.' [Citation.] . . . 'In dependency cases the doctrine has been applied only in cases of the most egregious conduct by the appellant that frustrates the purpose of dependency law and makes it impossible for the court to protect the child or act in the child's best interests . . . .'" (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1399, italics omitted.) Although Carl did not cooperate with the Agency, we conclude that his conduct cannot be categorized as being among "the most egregious." We therefore decline to dismiss the appeal under the doctrine of entitlement.

The court proceeded on the assumption that Carl was a noncustodial parent.[2] "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a [noncustodial] parent . . . who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd (a).) "[O]nce dependency jurisdiction is acquired because of the custodial parent's conduct, the court's inquiry shifts to a focus on the child's best interests, albeit with a preference towards parental reunification. " (*In re Luke M*. (2003) 107 Cal.App.4th 1412, 1425.)

In the juvenile court, the Agency must prove detriment by clear and convincing evidence. (*In re Luke M*., *supra*, 107 Cal.App.4th at p. 1426; *In re Isayah C*. (2004) 118 Cal.App.4th 684, 700; *In re John M*. (2006) 141 Cal.App.4th 1564, 1569-1570.) On appeal, we apply the substantial evidence standard of review, and view the record in the

_____

[2]    There is no evidence to support this assumption. "[N]oncustodial parent" signifies the parent "with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300." (§ 361.2, subd. (a); *In re V.F.* (2007) 157 Cal.App.4th 962, 969.) Carl testified that Carmelo lived with him most of the time and C.E. declared that Carmelo lived primarily with Carl. It would therefore have been more appropriate for the court to proceed according to section 361. Under that section, the court would have been required to return Carmelo to Carl unless the Agency proved, by clear and convincing evidence, that "[t]here is or would be a substantial danger to [Carmelo's] physical health, safety, protection, or physical or emotional well-being" and that there were no reasonable alternative means of protecting his physical health. (§ 361, subd. (c)(1).) We conclude that the error in proceeding under section 361.2 rather than section 361 is harmless in this case because we conclude that the result under section 361, which is subject to the substantial evidence test (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420), would be the same as the result under section 361.2.

light most favorable to the court's order. (*In re Luke M.*, *supra*, at p. 1426.) " ' "The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.] Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' [Citation.]" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, quoted in *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

Although a home evaluation was not required before Carmelo could be moved into Carl's home (§ 361.2, subds. (a), (b)), the court properly insisted on knowing where Carl would be living, in order to be able to assess whether the home and/or its occupants would present a danger to Carmelo. This requirement did not, as Carl asserts, assign to him "the burden of proving he was a fit parent." As additional support for his argument that the juvenile court shifted the burden to him to prove his fitness as a parent, Carl cites another statement by the court, i.e., that Carl "prevented the Agency from doing its job here, and shouldn't be heard to complain and talk about burden of proof when it's his own actions or inactions that have put up a barrier to the Agency finding out what it needed to know or finding out enough at least to be made comfortable with the decision to place

[Carmelo] with [Carl]." Although the court's intent in making this statement is unclear, it is clear that the court understood that the Agency had the burden of proof. On October 19, 2012, during a discussion concerning placement, the court expressly stated that the Agency bore the burden of showing that placement with Carl would cause detriment to Carmelo. Carl also asserts that on October 19, the court found that the Agency had failed to carry its burden of showing detriment. However, the court made no such finding. Rather, the court simply stated that not knowing where Carl would be living and under what conditions did not, in and of itself, constitute detriment.

Carl cites *In re Z.K.* (2011) 201 Cal.App.4th 51 (*Z.K.*) in support of his argument that the court erroneously required him to prove his parental fitness. In *Z.K.*, the father left Nevada with infant Z.K. and essentially disappeared. (*Id*. at p. 55.) The mother eventually returned to her home state of Ohio but never stopped searching for Z.K. (*Id*. at pp. 55-56.) Five years later, she learned that the father had been arrested in California and that Z.K. was in foster care. (*Id*. at p. 55.) By that time, the section 366.26 hearing was imminent. (*Ibid.*) The mother immediately requested custody of Z.K. (*Ibid.*) Neither the court, the social services department (the department), nor the mother's appointed attorney recognized that the mother had a constitutional right to custody unless it was proven, by clear and convincing evidence, that giving her custody would be detrimental to Z.K. (*Ibid.*) "[T]he department—with the complicity of the juvenile court, and with no meaningful opposition from mother's attorney—essentially required mother to prove her fitness to be Z.K.'s custodial parent through multiple home studies and psychological examinations." (*Ibid.*) The juvenile court found that the mother had not

10

proved her fitness and terminated parental rights. (*Ibid.*) The reviewing court reversed, holding that, "by terminating her parental rights without finding it would be detrimental to the minor to be placed in her custody, the juvenile court violated mother's constitutional right to due process of law, which is rooted in her fundamental interest in the care, companionship, and custody of her child." (*Id*. at pp. 55-56.) The reviewing court also concluded that "there was no evidence to support an implied finding of detriment." (*Id*. at p. 56.)

*Z.K.* is easily distinguishable from the instant case. L.K., the mother in *Z.K.*, was forthcoming and cooperative with the department. (*Z.K.*, *supra*, 201 Cal.App.4th at pp. 60, 67.) L.K. allowed her home to be inspected. (*Id*. at pp. 59, 62, 68.) She visited Z.K., and the visits went well. (*Id*. at p. 59.)

Unlike L.K., throughout this case Carl was evasive about where he lived. By November 13, 2012, he still had not provided Ruff with his home address and had failed to respond to Ruff's multiple attempts at contact. As a result, critical information concerning Carl's home was lacking. Further, Carl had not visited Carmelo for approximately two months. Carl falsely claimed that he had communicated with Carmelo via Skype. Even if this claim had been true, this type of contact would not assist in strengthening a bond with such a young child. In addition, Carl had promised to help with Carmelo's support, but had not provided any assistance since August or September 2012. At that time, Carl merely gave the caregivers diapers, wipes and some clothing. At the same time, Carl claimed that he worked hard and sent his older son to private school. Further, Carl continued to use marijuana after Ruff had advised him to stop.

11

Ruff made every effort to move Carmelo into Carl's home, and the court supported those efforts. However, Carl utterly failed to cooperate. It was his own actions, and not those of the Agency or the court, that led to Carmelo's placement with D.H. rather than with Carl. There is substantial evidence to support the juvenile court's finding that Carmelo would suffer detriment if he were placed with Carl.

Carl also contends that the court failed to issue an order to ensure that he was provided regular and consistent visitation. On October 19, 2012, when Carl's counsel asked the court to order at least two visits per week, the court stated that Carmelo needed "frequent and continuing visits." If counsel believed that this response was inadequate, she should have said so. Further, if Carl had wished to visit, he could have responded to Ruff's calls and letters. Any lack of visitation resulted solely from Carl's persistent failure to communicate and cooperate with the Agency.

## DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

12