Filed 1/15/14  In re K.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re K.M., a Person Coming Under the Juvenile Court Law. | C072564 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.S.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD231465) |

Marilyn. S., mother of Kristen M. (born September 1996, hereinafter the minor), appeas from the juvenile court's November 8, 2012 order prohibiting any contact between mother and the minor. On appeal, mother contends the "no-contact" order constitutes impermissible punishment and is not supported by sufficient evidence. We disagree and shall affirm the no-contact order.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The minor was removed from mother's home (along with her brother and sister) in December 2010.[1] (*In re J.M. et al.* (May 30, 2012, C068694) [nonpub. opn.].) In July 2011, the minor was adjudged a dependent child and placed in the custody of her father. Mother was given visitation, the details of which were to be determined by the Sacramento County Department of Health and Human Services (the Department).

By January 2012, the minor tried to run away from father's home. Accordingly, the Department filed a section 387 petition and placed the minor in a foster home. The minor continued to exhibit self-destructive behavior while in the foster home (e.g. disappearing for hours, taking a pipe and lighter to school, repeated unexplained absences from school).

On March 22, 2012, the juvenile court found true the allegations in the section 387 petition and amended mother's reunification services to include additional counseling for mother, as well as random testing for drugs and alcohol. A week later, the minor was moved to the Children's Receiving Home (CRH) at her own request. That same day, March 28, 2012, the minor ran away from CRH and the juvenile court issued a protective warrant.[2] Nearly a month later, the minor was located in Seattle, Washington and returned to Sacramento.

*The Department's Section 388 Petitions*

On May 24, 2012, the Department filed a section 388 petition, asking the juvenile court to allow the minor to go from the CRH to the home of Carolyn C., a non-related extended family member (NREFM), for an extended visit. The Department noted that the minor was already staying with Carolyn C. and was agreeable to remaining there until

---

[1] The minor's siblings are not involved in this appeal.

[2] The warrant was later recalled.

an appropriate placement could be found.

In support of its petition, the Department represented that the minor had been "AWOL" from the CRH for "an extended period of time." While AWOL, the minor "participated in dangerous behavior," including drug use and prostitution. As a result of these behaviors, the minor had been physically abused by a "pimp" and contracted a sexually transmitted disease. The juvenile court denied the petition.

On June 5, 2012, the Department filed another section 388 petition asking the same thing. The court set a hearing for later that month; pending that hearing the minor was ordered "to spend no more than 2 nights in the home of a relative/NREFM in any 7 day period."

Before the hearing, the minor's self destructive behaviors returned; she was taking "any medication she could find" trying to "get high," and she was using the Internet to meet men. Carolyn C. suspected the minor was, again, prostituting herself. The Department attempted to place the minor in a level 14 group home but before she could be moved, the minor ran away. Earlier that month, Carolyn C. had allowed the minor to visit mother for a week without the Department's permission, and when the minor ran, she returned to mother's home.

At a hearing held on August 16, 2012, the Department advised the juvenile court that the minor was AWOL and it had information that mother was "harboring the child." Accordingly, the Department withdrew its section 388 petition. The juvenile court terminated mother's reunification services and ordered mother to appear in court with the minor on September 6, 2012.

Mother appeared at the September 6, 2012 hearing and the court ordered her to have only supervised visits with the minor, "as arranged and directed by [the Department] as in the [minor's] best interests." The following day, the court issued a custody warrant for the minor when she again went AWOL; the court also ordered mother to appear in court to address the minor's renewed AWOL status.

3

*September 13, 2012*

On September 13, 2012, mother appeared in court to address the minor's status. According to the Department and mother, on September 11, 2012, law enforcement found the minor in mother's home. Law enforcement took custody of the minor and drove her to a local shelter, from which the minor quickly ran away. Thus, at the time of the hearing, the minor was, again, AWOL.

In response to the juvenile court's questioning, mother acknowledged she had taken the minor into her home on September 11, 2012, ignoring the court's order that her contact with the minor be supervised. She explained that the minor called her and said she was at the Santa Cruz Boardwalk. According to mother, when her attempts to reach the social worker and her attorney failed, mother contacted "a personal friend" who worked for the San Jose Police Department. That friend advised mother to have a family member pick up the minor because he was unable to do so due to a family situation. Mother told the court she contacted her own stepmother to retrieve the minor from the Boardwalk.[3]

The social worker indicated she was not working that day, but always leaves a number for people to call in case of emergency; mother did not call that number. According to the social worker, mother left several messages but mother never said she had the minor in her custody, only that the minor had contacted her. Mother also told father the minor was in Santa Cruz but did not want to contact law enforcement for fear the minor would "take off again."

Mother told the court that violating the court's order "wasn't the first thought that occurred [to her] because [her] daughter was out on the streets." The court responded, "Okay. Well, [mother], what you failed to understand is a large part of the reason that

---

[3] The Department later learned the stepmother was unable to retrieve the minor, so mother actually retrieved her.

your daughter is on the streets is because you're letting her play you. The expectation of this court is that you're going to follow court orders, that you're going to be an involved part of this process. It's been very clear to me from day one that you've been in Sacramento County that you're interested in doing your own dealing and your own program and not interested in what the court has to say. That's part and parcel of the problem is that you send a message to your daughter that that's okay. You heard me spend an hour talking to [the minor] a week ago about making good choices and about her responsibility for her choices. You have to act like a parent and say I'm not taking you in. Tell me where you're at and I'll help get to law enforcement to help you get back so you could get to the place where you need to be, because I'm not going to jail because you want to make poor choices. That's what a real parent would say to her 15-year-old daughter that's running the streets that wants me to believe that she is being beaten and sexually abused and horrible things are happening to her. All you're doing is enabling you daughter to continue to be victimized.

"THE MOTHER: Your Honor, I had that very discussion with [the minor]. I made it very clear to her. That this is --

"THE COURT: [Mother], apparently you don't understand. You're not to be having any discussions with [the minor] that somebody from [the Department] does not understand [*sic*], because I simply don't trust you and believe you anymore."

After considering the evidence, the court ruled as follows: "All right. And the Department at the last hearing had requested that I order no contact between [mother] and [the minor], and the court was reluctant to do that for the reasons I stated last week. I am inclined to modify that order at this time." Minor's counsel agreed to the no-contact order, but admitted to not knowing the minor's position on the issue given that the minor was still missing. The court then issued a no-contact order, precluding mother from having *any* contact with the minor: "That includes no telephone contact, no cellular phone contact, no e-mail contact, no personal contact, no contact through other

5

individuals, which means that other individuals are not to be used as a conduit to [mother].

"If [the minor] contacts [mother], [mother] is hereby directed to advise [the minor] that there is a court order in place prohibiting their contact, and to encourage [the minor] to call [a social worker], her court-appointed counsel for appropriate direction or to contact [father], whom the court trusts at least will respond appropriately in terms of complying with the orders of the court to secure [the minor's] presence back into protective custody." The court further ordered mother to appear on September 18, 2012, for arraignment on a contempt citation, and the Department to prepare a report on exactly what happened on September 11, 2012, after contacting mother's friend at the San Jose Police Department. The court then set a review hearing for November 1, 2012.

*November 8, 2012*

Mother failed to appear in court on November 1, 2012, due to transportation issues. The court agreed to continue the hearing for one week and issued a warrant for mother's arrest, staying the warrant until November 8, 2012.

On November 8, 2012, mother and the minor both appeared in court. Mother's brothers, Bob and Gary were also present. Bob, who brought the minor to court, explained how he picked up the minor from an empty trailer in Hayward, California after he had been contacted by mother. According to Bob, mother did not tell him there was a warrant out for the minor or that he should contact the social worker. Bob kept the minor with him for several days while he contacted several "agencies" to determine what he should do with the minor. Gary, who had already contacted the social worker, gave Bob the social worker's phone number and Bob called her.

According to the social worker, the minor was living with her maternal step-grandmother (Kathy) in Hayward while she was AWOL; the empty trailer was owned by Kathy's boyfriend. The social worker had sent law enforcement to Kathy's home while

6

the minor was missing three times to no avail.  By the minor's account, mother was "in and out" of Kathy's home during that same time period.

After hearing from the Department, the juvenile court noted mother's repeated failures to comply with the court's order and suggested the Department pursue criminal charges against mother and Kathy for their conduct.  The Department indicated its intent to place the minor in a facility in Arizona.  Pending that placement, the minor asked if she could stay with Gary.  From the audience, Gary expressed a willingness to safeguard the minor her until she could be moved to Arizona.

The Department was amenable to temporarily placing the minor with Gary, but it sought another no-contact order between mother and the minor.  The court ordered the Department to assess the uncles for temporary placement and agreed a no-contact order between mother and the minor was warranted:  " . . . I think I've been very patient in attempting to work with [mother] and ensure that she is having ongoing contact with her child.  I just don't think it's beneficial for the child anymore.  So I'm stopping it."  The court also issued a no-contact order between Kathy and the minor.  Mother objected to the no-contact order.

The juvenile court also advised Bob and Gary that a failure to follow court orders would not be tolerated:  "I know the uncles aren't aware of the entire history of this case.  I could just tell the two of you that to be very frank, I'm kind of done with [mother].  If this were a criminal court, I'd lock her up.  It's very, very clear to me that she has violated orders of this court, that she has little, if any, regard for the directions of the Court. . . .  And it's important that the two of you understand that I'm telling the Department to go to law enforcement about criminal charges for people that don't comply with my orders."

Mother appeals.

## DISCUSSION

Mother contends the no-contact order constitutes impermissible punishment and is not supported by the evidence. We disagree.

"The purpose of a dependency proceeding is to *protect the child*, rather than prosecute or punish the parent. [Citations.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1395.) Here, the juvenile court expressed its frustration with mother and her ongoing refusal to follow the court's orders, which had resulted in a failure to protect the minor. The court thus issued the no-contact order to protect the minor from mother's conduct. That the court believed mother's conduct warranted criminal punishment was evident, but clearly irrelevant to its no contact order.

Accordingly, we conclude the juvenile court's November 2012 no-contact order did not constitute impermissible punishment.

Mother next suggests the juvenile court erred by not making an "express finding of detriment, as required by statute. . . ." To the extent mother intends this as a claim of error on appeal, she forfeited review of this issue by failing to specifically object to the lack of such finding in the juvenile court.

"General objections are insufficient to preserve issues for review. [Citation.] The objection must state the ground or grounds upon which the objection is based. [Citation.]" (*In re E.A.* (2012) 209 Cal.App.4th 787, 790.)

Here, mother's counsel objected to the initial no contact order in September 2012, stating, "I would object to the no-visitation order." Counsel renewed the objection at the November 8, 2012 hearing: "I believe we objected at the hearing as to the no-contact order or visitation order. We continue that objection today." Had counsel specifically objected on the grounds that the court had not found detriment, the court could have addressed the deficiency. Accordingly, mother has forfeited her claim.

8

In any event, as we discuss immediately *post*, here there was sufficient evidence to support an implied finding of detriment. (See *In re Z.K.* (2011) 201 Cal.App.4th 51, 66 [finding *insufficient* evidence to support an implied finding of detriment from termination of services, supervision of visits, and failure to pass home study].)

Finally, mother contends there "is no evidence that the visits between her and [the minor] caused detriment to [the minor]."

Following the termination of reunification services, "the court shall continue to permit the parent or legal guardian to visit the child unless it finds that visitation would be detrimental to the child." (§ 366.22, subd. (a).) In reviewing the sufficiency of the evidence to support a trial court's rulings, an appellate court applies the substantial evidence standard of review. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.) Under this deferential standard of review, mother bears the burden to show insufficient evidence, and we must review the evidence in the light most favorable to the trial court's order, drawing all reasonable inferences and resolving doubts in favor of the court's order. (See *In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.) We will infer any implied findings if substantial evidence supports them. (See *In re S.G.* (2003) 112 Cal.App.4th 1254, 1260 [the "pertinent rule of appellate review" is that appellate court "will infer a necessary finding provided the implicit finding is supported by substantial evidence"].)

Here, when the minor first ran away, she was found with a friend in Seattle. After that, she was placed in the CRH but was staying with Carolyn C. The minor was doing well enough to prompt the Department to seek to have her placement changed from the CRH to Carolyn C.'s home. Then Carolyn C. allowed the minor to spend an unsupervised week with mother. Soon after, the minor returned to her self-destructive behaviors, including drugs and prostitution.

When the minor ran away a second time, she ran to mother, who "harbored" the minor until she was ordered to bring the minor to court. The day she was brought to court, the minor ran away again and again was found in mother's custody. Mother,

9

again, expressed in court an unwillingness to work with the Department or the juvenile court to ensure the minor's safety. And, when the minor ran a third time, she was found in a trailer owned by mother's stepmother, and was living there with mother's knowledge.

Mother argues the minor should not be "deprived of all contact with mother simply because mother violated a court order. . . ." But mother's contact has consistently allowed, and arguably encouraged, the minor to continue to run from her court-ordered placement and corresponding services. Mother's repeated, unauthorized contact with the minor also continued to place the minor in dangerous situations (e.g. living in an empty trailer).

Indeed, mother's violation of multiple court orders under these circumstances was evidence that she was not acting in the best interests of the minor. It was evident from the pattern of the minor's behavior (as noted by the juvenile court) that mother was "enabling [her] daughter to continue to be victimized. . . ." The evidence supports a finding that continued contact between the minor and mother would cause further detriment to the minor. Thus the juvenile court's no-contact order was supported by sufficient evidence.

**DISPOSITION**

The order of the juvenile court is affirmed.


                                        DUARTE            , J.

We concur:



    MAURO            , Acting P. J.


    MURRAY          , J.


10