Filed 4/22/14  In re E.B. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.B. et al., Persons Coming Under the Juvenile Court Law. | H040033 (Santa Clara County Super. Ct. Nos. 108JD19147, 108JD19148, 108JD19149, 108JD19150) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. V.B., Defendant and Appellant. | |

V.B. (mother) appeals from the juvenile court's order terminating visitation to her children, E.B. (born 1998), L.B. (born 2001), A.B. (born 2003), and O.B. (born 2003), following a contested Welfare and Institutions Code section 366.3 hearing.[1]  Mother argues that insufficient evidence supported the juvenile court's finding that her visits were detrimental to each of her four children.  Because substantial evidence supported the juvenile court's finding of detriment, we affirm.

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

1. **The Dependency Action**

In August 2008, the Santa Clara County Department of Family and Children's Services (Department) filed petitions pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (g) (no provision for support), and (j) (abuse of a sibling). Minors E.B., L.B., A.B., and O.B. were placed into protective custody, as mother had struck A.B. on the nose while she was intoxicated.[3] The juvenile court removed the children from mother's home in October 2008 and ordered reunification services. Mother was ordered to take parenting classes, attend a substance abuse program, and participate in a psychological evaluation. The children were placed with a nonrelative extended family member.

The Department filed a six-month status review report in April 2009. The report indicated the children were in a safe environment but there were concerns about the children's "mental, emotional and sexually acting out behavior." The children were showing anxiety, were soiling themselves at night, and had disclosed that they suffered "physical and sexual abuse" while in mother's care. The court continued mother's reunification services.

The Department prepared another status review report in October 2009. The report indicated all four children were exhibiting anxiousness and hyper vigilance. O.B. was having issues with fecal incontinence and bursts of anger that occurred around her visits with mother. By January 2010, the children continued to have problems before and after visits with mother. O.B. and A.B. were being physically assaultive toward each

---

[2] This court took judicial notice of the record in mother's prior appeal in H038851, *In re E.B. et al.* We derive some of the facts of this case from the record in this prior appeal.

[3] Mother has another child, M.B., who is not a part of the appeal.

other, and one visit had to be cut short after all the children began acting out. The social worker referred the family for therapeutic supervised visitation. In January 2010, the juvenile court continued mother's reunification services and terminated father's services.

In July 2010, the Department recommended termination of mother's reunification services in a status review report. The juvenile court terminated mother's reunification services in August 2010 and the four children were put in a planned, permanent living situation. The Department recommended the court set a selection and implementation hearing under section 366.26.

In 2011, the minors' counsel filed a section 388 petition seeking to terminate visits between mother, A.B., and O.B., arguing that the visits were detrimental to the two children. The juvenile court declined to make a detriment finding and suspended mother's visits with A.B. and O.B. for one year. In March 2012, the juvenile court ordered guardianship as the permanent plan after a section 366.26 hearing. Mother was granted twice-monthly scheduled visits with E.B. and L.B. No additional visits were ordered for A.B. and O.B. due to the court's earlier suspension of visits.

### 2. Postpermanency Proceedings

The Department prepared a status review report for the postpermanency status review hearing (§ 366.3) in September 2012. The report recommended the court authorize continued legal guardianship for the four children and for mother to have twice-monthly supervised visits. It also noted the children were happy residing in the home of the legal guardian, and the guardian was committed to raising the children. During the reporting period, L.B. was the only child who had attended visits with mother, because E.B. refused to visit mother. Due to the court's temporary suspension of visits, A.B. and O.B. also had not had any visits with mother. A.B. and O.B. had discussed visiting mother, but O.B. had said she did not want to visit "because of how I behave after." The

3

Department requested an assessment from the respective therapists about the readiness and appropriateness of reinstating mother's visits with A.B. and O.B.

The Department prepared an addendum report in September 2012 recommending that the court approve the orders and recommendations submitted in the status review report prepared in September 2012, except for the orders regarding O.B. The addendum recommended O.B. be approved for a "Level 13/14 Residential facility" as her behavior had deteriorated to the point where her legal guardians did not believe they could keep the other family members safe. O.B. was exhibiting violent behavior, including physical aggression.

In a second addendum report prepared in October 2012, the Department recommended the juvenile court make a finding of detriment between E.B., A.B., O.B., and mother. The report made the following assessments and observations about the four children:

*E.B.*--E.B. had chosen not to visit with mother during the past reporting period, and E.B.'s therapist had indicated E.B. said visits with mother made her angry. In one incident, E.B. heard negative comments made by mother and some maternal relatives about herself and the legal guardian when E.B. had a middle school education court hearing in October 2012. During the hearing, E.B.'s attorney reported E.B. had requested she not be required to attend the hearing if mother was there. After hearing this request, mother, maternal aunt, and maternal grandmother expressed anger and left the courthouse, making comments that the guardian was "evil" and that E.B. was "being held prisoner." E.B. and her legal guardian were nearby and heard the comments. E.B. later asked the social worker to "take her choice away" regarding visits with mother. E.B. explained L.B.'s visits with mother made her feel guilty and angry. E.B. also stated that every time she was asked about visiting mother she felt a wide range of emotions including anger, depression, sadness, and fear. E.B. was also afraid that her extended

4

family would come to her at school and confront her about not requesting to be returned home. E.B. said she wanted to be "left alone and be allowed to be a kid."

*A.B.*--A.B. had not had visits with mother during the recent reporting period, as visits had been suspended for one year in August 2011. However, whenever the issue of visits with mother was brought up, A.B. would become emotionally and behaviorally unstable. In September 2012, after being asked about resuming visits or attending court, A.B. "shut down." She "sank into the couch, closed her eyes and took her two fore fingers and began poking her eyes." A.B. stated that discussing visits and court hearings caused her stress, and the social worker noted that bringing up the topic of visitation transformed A.B. from "a talkative and happy little girl to a very withdrawn and avoidant child."

*O.B.*--O.B., who also had visits with mother suspended for a year, acted aggressively when asked if she wished to resume visits. O.B. said mother "bruised me and pulled [E.B.'s] hair and my hair. [Mother] even broke [E.B.'s] arm before I was born." O.B. would become extremely tense when asked about visits, and the social worker opined that further discussions about visitation would result in a tantrum, destruction of property, or physical aggression.

*L.B.*--When asked about visits, L.B. said she remembered the "beatings and hitting and inappropriate sexual acts" while under mother's care. L.B. wanted to live with mother but expressed she did not want to return to mother's care immediately because visits were enough. L.B. stated she knew bringing up the past with her sisters upset them, and she was trying not to bring up the subject with her siblings. However, the legal guardian reported there was one recent incident during a family dinner where L.B. questioned her siblings about their past abuse. During the dinner, L.B. asked A.B. if she "remembered getting a black eye, bloody nose and a fat lip from our mother." The guardian reported that after L.B. asked this question A.B. immediately sank into her seat,

5

O.B. stared angrily at L.B., and E.B. put her head down and sat quietly. L.B. later explained she had asked the question because she wanted to know if A.B. remembered the event. The social worker concluded that L.B. was provoking her siblings so she could maintain some sense of control, an issue that L.B. should continue to address in therapy.

The Department prepared another addendum report in December 2012. This report again recommended that the juvenile court make a finding of detriment between E.B., A.B., O.B., and mother. The report noted that O.B. had been hospitalized on December 13, 2012, on a section 5150 hold. Hospital staff found O.B.'s behavior had become increasingly out of control, as O.B. had attacked the legal guardian with a pot. The social worker opined he believed that it would take time for O.B. to become emotionally strong enough to confront mother regarding the past trauma she endured while under mother's care.

In an additional addendum report prepared in February 2013, the Department recommended the juvenile court make a finding of detriment between L.B. and mother. The report indicated L.B. no longer wanted to have visits with mother. During a recent visit, mother had given L.B. a note card that said: "anything happen call me," with an included phone number. L.B. said mother had told her to misbehave so she could return to mother's care and had told her to tell E.B. to come to visits. L.B. said that these actions by mother made her feel like she hated her life and wanted to kill herself.[4] L.B. also gave the social worker a letter she wrote to mother dated January 28, 2013, where she told mother that she did not want to have any more visits because mother was causing her stress.

---

[4] Joe Sanchez, the social worker who prepared the report, testified during the section 366.3 hearing that after L.B. made these statements he assessed her and concluded that she did not have a suicide plan.

### 3. The Contested Section 366.3 Hearing

#### a. *Joe Sanchez's Testimony*

The juvenile court began the contested section 366.3 hearing in December 2012. The social worker who prepared the status review reports and addendum reports, Joe Sanchez, testified as an expert in risk assessment. Sanchez had been assigned to the case since 2009. Sanchez testified that all four children had been diagnosed with posttraumatic stress disorder as a result of the trauma they had experienced under mother's care. The children had been previously exposed to inappropriate sexual behavior between mother and her boyfriend. O.B. and A.B. had been sexually molested by several male cousins while under mother's care. The children had been removed after mother physically assaulted A.B., hitting her on the nose. All four girls and their younger brother M.B. were removed from the home after the incident.

Sanchez explained E.B. had visited mother on occasion, including at least one visit in 2012. Sanchez reiterated he believed a finding of detriment was necessary for E.B. because E.B. felt guilty after L.B. had visits with mother. Additionally, E.B. did not like having to discuss the visitation issue every six months and was fearful of cousins confronting her at school about living with mother. Sanchez opined that a detriment finding would give E.B. a sense of control but admitted he would still have to ask E.B. about visiting mother when he prepares future section 366.3 reports. He also recalled that E.B. told him she had felt terrified and physically ill after seeing mother in court in February 2012, and E.B. had refused to attend middle school court if mother was present. Sanchez also asserted that E.B. had said she did not want to have visits with mother.

Sanchez also testified about the impact of visits on A.B, who said talking about visiting mother caused her stress. Sanchez acknowledged A.B.'s therapist reported A.B. did not discuss her mother during therapy and A.B.'s child advocate said A.B. talked fondly of her visits with mother. However, Sanchez opined that A.B.'s progress would

7

be hindered with exposure to mother, reasoning that A.B. would often become withdrawn and depressed upon mentioning visits.

Similarly, Sanchez reasoned a detriment finding would be beneficial to O.B. He testified that before visits to mother were temporarily suspended, O.B. had acted aggressively during visits. In one visit, O.B. had to be restrained after she physically attacked mother. Previously, O.B. would soil herself before and after visiting mother. Sanchez reported these incidents were reduced after visits to mother were stopped. Sanchez explained O.B. had been hospitalized twice under section 5150 holds and had been removed to a professional parent foster home in October 2012 by a section 387 petition. O.B. had been returned to the legal guardian in December 2012.

As to L.B., Sanchez acknowledged that L.B. herself had requested termination of visits. Sanchez reported L.B. said mother had behaved inappropriately during some visits. L.B. had told Sanchez that mother had given her notes and gifts, even though mother had been previously cautioned against passing notes by Sanchez and the juvenile court. L.B. had also told Sanchez that mother had instructed her to misbehave at the guardian's home. L.B. would sometimes return from visits with mother with messages for her siblings, including A.B. Sanchez observed that A.B. would become withdrawn after receiving these messages from mother. Sanchez expressed concern that E.B., A.B., and O.B. would "potentially decompensate to the point where the placement is no longer a viable option" if they were to have visits with mother.

b. *Uyen Lai's Testimony*

Uyen Lai, a marriage and family therapist trainee working with O.B., testified. Lai had been working with O.B. for approximately eight months. She had seen O.B. for weekly visits during the first six months, and had seen her twice-monthly for the past two months. Lai had not met mother and had not observed O.B. with mother. Lai asserted she did not feel that she had worked with O.B. long enough to render an opinion on

8

whether visits with mother would be detrimental. She also reasoned she had not worked long enough with O.B. or with mother to determine if O.B.'s emotional well-being would suffer from being in contact with mother. However, Lai expressed concern over O.B. visiting with mother against her wishes given the history of physical abuse by mother. She asserted O.B. had difficulty talking about her past trauma in therapy and opined that O.B. may have a hard time controlling her anger or behavior if she was given contact with mother.

### c. Arlene Roquette's Testimony

Arlene Roquette, a marriage and family therapist working with E.B., also testified. Roquette had been assigned to work with E.B. between April 2012 and October 2012. Roquette confirmed E.B. had told her that visits with mother made her angry and that she did not want to have visits with mother at all. At one point, E.B. had expressed a willingness to work on her anger issues so she could visit mother, but she later changed her mind. Roquette stated she had not met mother, and she had not observed mother and E.B. together. Roquette opined she did not feel she could determine if it would be detrimental to E.B.'s emotional health to have contact with mother since she had not seen E.B. in several months.

### d. L.B.'s Testimony

L.B. was the only one of the four children to testify at the contested hearing. She maintained she did not want visits with mother because mother was asking her to pass notes. L.B. said she would often receive notes from mother during visits, and she would throw the notes away before reading them. L.B. asserted that receiving notes from mother made her nervous. Mother also gave L.B. gifts during some visits, but when L.B. received gifts from mother her siblings would get upset. Mother also asked L.B. to ask E.B. to come visit. Asking E.B. to go visit mother made L.B. feel "bad." L.B. also stated that mother said negative things about Sanchez during the visits. She acknowledged that

9

she had told Sanchez that the visits with mother were "crazy" because mother often brought younger brother M.B., who was difficult to control. L.B. said she was unsure if the visits with mother would be better if mother did not bring M.B. and did not pass notes. L.B. reiterated she did not want visits with mother, even if someone was present during the visits to ensure mother did not pass notes.

### e. Mark Forest's Testimony

Mark Forest, a social worker with the Department, testified. Beginning in October 2011, Forest supervised the visits between L.B. and mother and transported L.B. to the visits. Forest said L.B. was generally willingly to visit with mother and was usually in a good mood while being transported to the visit site. During the visits, L.B. and mother would often have a meal together and would engage in activities including board games and card games. Forest testified he could not recall mother giving notes to L.B.

### f. Malaika Mukoyama's Testimony

Malaika Mukoyama, a social worker with the Department covering the case while Sanchez was on vacation, testified during the hearing about a conversation she had with L.B. Mukoyama said L.B. had told her in March of that year that she would "maybe like to see her [m]other next month."

### g. Mother's Testimony

At the hearing, mother testified she had given L.B. the note with her phone number because she was concerned about O.B. Mother denied regularly passing notes to L.B. and explained she would sometimes communicate to L.B. during their visits by writing down notes on paper because of her hearing impairment. She further testified she had written notes to L.B. in front of Forest, who supervised some of the visits, and she had not intended for L.B. to take the notes home. Mother stated she would be willing to meet with the therapist for her four daughters in order to assist them in their therapy and expressed her desire to see her daughters. Mother denied telling L.B. to misbehave at the

10

guardian's home.  She maintained she had never told L.B. that Sanchez lied.  She said she had told L.B. she did not appreciate Sanchez because he did not make efforts to communicate with her.

### h.  Closing Arguments

The juvenile court requested the parties submit written closing arguments at the end of the contested hearing.  The Department argued detriment had been established because (1) all four children refused to visit mother, (2) all four children became distressed when the topic of visits were discussed, (3) all four girls were subjected to trauma while in mother's care and had been diagnosed with posttraumatic stress disorder, and (4) when visits actually occurred between mother and the children, some of the children would soil themselves before and after the visits, and O.B., in particular, would sometimes become physically aggressive.

Mother argued each child must be considered as an individual.  She reasoned there was no evidence of detriment to A.B., as the reports provided little information about what A.B. wanted.  Similarly, mother argued the status reports did not indicate that E.B. did not want to visit mother, only that E.B. felt anxiety and pressure from relatives and other individuals discussing visitation with her.  Mother insisted there was little evidence showing that O.B.'s violent behavior or deterioration was a result of visiting mother.  She also opined that L.B. may have been dishonest to the court.

The children's counsel argued that O.B., A.B., E.B., and L.B. had all expressed that visits with mother caused them stress and urged the court to "support the stability of their placement by making a detriment finding."

### 4.  The Juvenile Court's Order

The juvenile court issued a written order on July 11, 2013, finding visits between mother and her four children were "detrimental to their physical and emotional well-being."  The court stated it had read and considered the testimony of the witnesses at the

11

contested section 366.3 hearing, the status review reports and addendum reports, and the closing arguments submitted by the parties. The court noted E.B. had not chosen to visit with mother since 2010 and had told Sanchez that she felt guilty after hearing L.B. talk about visits. E.B. also indicated she felt angry, depressed, fearful, and sad when asked about visiting mother. A.B. would become withdrawn and would disassociate when asked about visits. In contrast, O.B. would become aggressive and threatening when the issue of visits was brought up. The court acknowledged it had heard testimony from L.B., who stated she no longer wanted to visit mother because mother passed notes to her during visits and would speak negatively about Sanchez. The court thereafter granted the Department's request to terminate visits and mother appealed.

## DISCUSSION

### 1. Standard of Review

If a juvenile court orders guardianship as the permanent plan, it must "also make an order for visitation with the parents or guardians unless the court finds by a preponderance of the evidence that the visitation would be detrimental to the physical or emotional well-being of the child." (§ 366.26, subd. (c)(4)(C).) Visitation may be addressed by the juvenile court during a postpermanency review hearing under section 366.3. (*In re Kelly D*. (2000) 82 Cal.App.4th 433, 438.)

We review an order denying visitation for abuse of discretion and uphold the order if it is supported by substantial evidence. (*In re Daniel C.H*. (1990) 220 Cal.App.3d 814, 839.) " '"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.)

12

## 2. Substantial Evidence Supported the Juvenile Court's Determination

Mother contends the juvenile court erred because insufficient evidence supported its finding of detriment with respect to each of her four daughters.

Preliminarily, mother notes that the court ordered the Department to provide information from O.B. and A.B.'s respective therapists about the children's feelings about visitation after suspending mother's visits to the children in August 2011. She argues it is concerning that despite the court's order, the children's therapists did not provide concrete information about how O.B. and A.B. felt about visits with mother.[5] However, even without this specific information from the children's therapists on this point, there was sufficient evidence in the record to support the court's determination that visits with mother would be detrimental to O.B., A.B., L.B., and E.B.

*A.B.*

The Department's reports indicated A.B. reacted negatively and became stressed and withdrawn when she was asked about visits with mother and going to court. Sanchez testified that A.B. became distressed to the point where she poked her eyes with her fingers. Mother argues A.B. was asked a compound question about her feelings toward visiting mother and going to court, and the record as a whole establishes A.B. had negative feelings toward going to court, not about mother. However, Sanchez testified at trial that he believed A.B.'s reaction was a result of her feelings toward visiting with mother. The trial court did not err in crediting Sanchez's testimony and opinion on this matter.

---

[5] A.B.'s therapist had previously submitted a letter stating that A.B. refused to bring up the topic of mother or visiting mother during sessions. The family and marriage therapist trainee submitted a letter stating that it was her opinion that O.B. needed more time to process the previous family trauma before family visits could be recommended.

Mother insists Sanchez's opinion by itself is insufficient to support a detriment finding, citing to *In re Z.K.* (2011) 201 Cal.App.4th 51, 67 (*Z.K.*) and *In re Brian P.* (2002) 99 Cal.App.4th 616, 624 (*Brian P.*). These cases are readily distinguishable. In *Z.K.*, the appellate court concluded the social worker's testimony during the section 366.26 hearing about the last time she had contact with the mother was insufficient to support a finding of detriment because there was no information about why there was no contact and there was nothing in the record that would infer that a lack of contact would mean it would be detrimental for the children to be in her custody. (*Z.K.*, *supra*, at p. 67.) *Brian P.* is also distinguishable, as there the court concluded the social worker's opinion that the minor's chances of adoption were " 'very good' " was insufficient by itself to support a finding of adoptability. (*Brian P.*, *supra*, at p. 624.)

Mother contends the "proper basis for ruling parental visitation would be detrimental to a child is expert testimony giving specific examples of how that visitation would adversely affect the child or jeopardize the child's safety." She argues *In re David D.* (1994) 28 Cal.App.4th 941, 953-954 is persuasive. In *David D.*, the juvenile court held that harm or detriment to a child cannot be presumed by the fact that the parent has a mental illness; the social worker must demonstrate with specificity how the minor is or will be harmed as a result of the parents' mental illness. (*Id.* at p. 953.) The court thereafter reversed the order terminating the mother's parental rights and ordering the minors placed for adoption. (*Id.* at p. 956.)

Here, Sanchez did not base his opinion that visits with mother would be detrimental solely on any alleged mental illness on the part of mother. Nor did Sanchez opine, without any factual basis, that A.B. did not want to visit with mother or that visits would be harmful. Sanchez based his conclusions on his interviews with A.B. and his observations of her behavior, from which he formed the opinion that she became withdrawn and disassociative after being questioned about resuming visits with mother.

14

This led to his conclusion that visits with mother would pose a risk to A.B.'s emotional health.

Additionally, there was other evidence, aside from Sanchez's opinion, that supported the juvenile court's finding of detriment with respect to A.B. As the Department noted in its closing arguments, prior to visits being suspended with mother, A.B. would sometimes soil herself before and after visits with mother, but all of these episodes ceased upon suspension of visits from mother.

*E.B.*

There was also sufficient evidence that visits with mother would be detrimental to E.B. The Department's status review report indicated E.B. said she felt angry and guilty when L.B. spoke of visits, and she felt sadness, fear, and depression when asked about visiting mother. Sanchez testified during the section 366.3 hearing that E.B. had stated she did not want visits with mother. We agree with mother that "visitation may not be dictated solely by the child involved"; however, the "child's desires may be a dominant factor." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138; *In re Julie M.* (1999) 69 Cal.App.4th 41.) E.B. not only refused visits with mother, she also told Sanchez she felt terrified and physically ill after seeing mother in court. Sanchez therefore concluded in the addendum report prepared in October 2012 that visits would be emotionally harmful to E.B., sufficiently supporting the juvenile court's finding of detriment.

*O.B.*

As to O.B., Sanchez opined that O.B. became tense and aggressive when asked about visits. Sanchez noted O.B. had acted physically aggressive during previous visits. In one instance, O.B. had to be restrained after she attacked mother. O.B. used to soil herself before and after visits with mother, but these incidents reduced after visits were stopped. Lai, the marriage and family therapist trainee working with O.B., expressed concern over O.B. visiting with mother against her wishes, given the history of physical

abuse by mother. She also opined that O.B. may have a hard time controlling her anger if she saw mother. All of this evidence supported the juvenile court's finding of detriment.

*L.B.*

Sufficient evidence also supported the juvenile court's finding that visits with mother would be detrimental for L.B. L.B. testified during the contested section 366.3 hearing, asserting she did not want to visit mother. Again, while "visitation may not be dictated solely by the child involved," the "child's desires may be a dominant factor." (*In re Nicholas B.*, *supra*, 88 Cal.App.4th at p. 1138.) L.B.'s express desire not to visit mother was a factor the juvenile court was entitled to weigh heavily. L.B. also testified that mother's visits made her nervous, mother passed her notes during visits, and mother had told her to misbehave while at the legal guardian's home so that she could return to mother's care. Mother disputed much of L.B.'s testimony during the contested hearing, but it appears the juvenile court credited L.B.'s testimony over that of mother's and we cannot reweigh the evidentiary value of the testimonies. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199-200.) We therefore conclude that sufficient evidence supported the juvenile court's finding of detriment with respect to L.B.

*Sanchez's Testimony*

Mother also broadly claims the juvenile court incorrectly gave great weight to Sanchez's testimony and reports, because he is not a therapist. However, Sanchez was qualified as an expert in risk assessment. Given his expertise in this field, the juvenile court did not err in finding Sanchez's testimony about the risk of harm to the children if visits were to continue credible, or in giving his opinion a significant amount of weight. Certainly, there was some contrary evidence that came forth in the section 366.3 hearing that refuted Sanchez's assertions. However, as we previously noted, we cannot reweigh the evidence or substitute our judgment for that of the trial court, which is essentially what mother urges us to do. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.) "Under the

16

substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*Ibid.*)

On the whole, the evidence in the record was sufficient to support a finding of detriment between the four minors and mother. Therefore, the juvenile court did not abuse its discretion.

**DISPOSITION**

The order is affirmed.

_____
                                              Premo, J.

WE CONCUR:

_____
        Rushing, P.J.

_____
        Elia, J.

17