Filed 10/6/15  In re A.D. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.D. et al., Persons Coming Under the Juvenile Court Law. | C078210 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA D.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD234758, JD234759) |

Joshua D. (father) appeals from the juvenile court's dispositional order placing minors A.D. and D.D. into foster care.  (Welf. & Inst. Code, §§ 300, 395.)[1]  Father contends he should have received placement as the nonoffending noncustodial parent

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

(§ 361.2), and the court's finding that such placement would be detrimental to the minors was not supported by clear and convincing evidence. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In May 2014 the Sacramento County Department of Health and Human Services (the Department) filed petitions under section 300, subdivision (b) as to A.D. (five years old) and D.D. (seven years old). The petitions alleged that mother (C.S.) abused methamphetamine and heroin, suffered from mental health problems, had threatened to kill the minors and herself, and had failed on informal supervision. Father (identified as the "legal" father) was alleged to be living in Ohio.

According to the detention report, mother claimed she moved to California with the minors to get away from father, who lived with the paternal grandmother in Westerville, Ohio, because he engaged in domestic violence and substance abuse; he was frequently in jail. D.D. said he had not seen or spoken to father in a long time, and A.D. did not even remember his name. A probation officer in Franklin County, Ohio, stated that father was on probation until November 2015 for the felony of attempting to carry a concealed weapon; he had been sentenced to four to six months in a community-based correctional facility that provided therapy and a substance abuse "component."

Father stated that he was the minors' biological father, had signed statements of paternity for both, and was named on their birth certificates. He and mother were not married but had been engaged until they broke up and went their separate ways when D.D. was five years old. He used to call the minors daily, but now mother would not let him speak to them. He last had contact with them when mother brought them to Ohio the previous Christmas; he saw them once for four hours. He paid child support even though there was no custody order.

Father denied domestic violence against mother. The offense for which he was on probation consisted of "having a gun under the seat" without a permit while transporting large sums of money from a liquor store he managed. He had been addicted to opiates, in

2

particular Percocet, which he had first used two years earlier for a shoulder separation; he had "weaned" himself off Percocet and last used it in December 2013. He was about to start alcohol and other drug (AOD) treatment as a condition of probation. At the initial hearing, the juvenile court found father was the provisionally adjudicated father of the minors. In response to the court's subsequent parentage inquiry, the court received a 2012 Ohio judgment ordering father to pay child support for the minors.

An informational memorandum filed in June 2014 stated the minors were doing well in their current placement. D.D. had had one phone call with father, which raised no problems. However, A.D. refused to speak to father; she feared him because he had hit mother.

The jurisdiction/disposition report, filed in July 2014, recommended out-of-home placement for the minors and reunification services for the parents. The report stated it would be detrimental to the minors to place them with father because he had a history of substance abuse and domestic violence; there was no evidence he had become clean and sober or that he had benefited from AOD programs to date; he lacked insight into his problems; he denied committing domestic violence, even though A.D. had confirmed mother's allegations; and he had not participated in services for domestic violence or anger management.

Father had criminal convictions for driving on a suspended license in 2012 and receiving stolen property in 2013 in addition to his latest offense. As part of his most recent sentencing, he was ordered to complete inpatient and outpatient substance abuse treatment programs, submit to drug testing, obtain his GED, and not to carry any weapons.

According to mother, father tried to beat her with a baseball bat, and when she blocked him he "permanently broke her pinky finger." He regularly beat her, and he sometimes threatened to kill and bury her. His threats had frightened her out of attempting to get a restraining order against him. He had also forced her to use cocaine

3

for the first time. She claimed that he dealt drugs, had a lot of money and expensive cars, and was "into anything and everything," "just like the maternal [*sic*] grandmother."

Mother was concerned about father having contact with the minors. He had been alone with them only twice in their lives; on one of those occasions, according to D.D., he took them to a house party that featured alcohol. He had not contacted them in three years.

Father sent an eight-page fax to the Department, including a letter in which he stated his love for the minors and his desire to have them in his custody. He said he loved them and missed them "more than you will ever know." He said he could provide a stable home for the minors with their own bedrooms, and he would have a lot of family support. Up until two years earlier, they had lived with him and he had met all their needs; mother had never worked. He attached a certificate of achievement for his successful completion of the Columbus Public Health Alcohol and Drug Treatment Program as of March 6, 2013, plus copies of Alcoholics Anonymous (AA), Narcotics Anonymous, and Cocaine Anonymous attendance forms for October and November 2013 and a copy of his "Ohio High School Equivalence Diploma" dated December 2, 2013.

Father said he had managed a store called the Wine and Cheese Emporium and had worked there for 12 years, until the business sold its liquor license. At the time of the July 2014 report, he had been employed by a moving company for a couple of months and also had a one-person lawn service.

Father claimed paternity of another child, born in 2000, who "was not more than a year old" when he died while in his mother's care. According to father, child protective services (CPS) was not involved in the case.

Father denied domestic violence with mother and claimed he had no idea why she was "making things up." They had never done anything more than argue and yell, sometimes in front of the minors.

4

Father said he had used alcohol from his teens until 14 months previously, when he was incarcerated on the concealed weapon charge; he admitted alcohol might be a problem for him, since he had gotten in trouble because of it. He used marijuana from age 18 until a couple of years before the July 2014 report but denied having a marijuana problem; he gave it up "because he thought it was time to get his life back together." He also began using cocaine at 18 but had stopped a few years earlier; he did not have a cocaine problem. He had been given a prescription for Percocet two years before, when his shoulder was injured; he had last used it on June 5, 2014, and did so "maybe once per month, if that," without a prescription. He denied having a problem with Percocet. He said he had learned "a lot of things" from his substance abuse programs but could not elaborate.

A.D., who was five years old, reported that things were going well in placement. She did not know father's name and did not recall ever living with him, but she reported that he physically abused mother, which made A.D. "sad and scared." She missed father only "a little" and did not want to speak with him. D.D., who was seven years old, reported that placement was going well. He remembered living with father, whom he said is named Josh, a "long time ago." He knew about the incident when father hit mother with a bat because mother told him about it; he was asleep when it happened. She also told him that father once put a gun to her ear. He loved and missed both parents. He wanted to live with father and mother, but first he wanted father to be nice to mother; his second choice would be to live with "Papa" in Ohio.

At the jurisdiction hearing, the juvenile court found that father was the minors' adjudicated father and sustained the allegations of the section 300 petition.

An addendum report filed in July 2014 stated that there had been CPS referrals on the family in Ohio, including a report that father had sexually abused a 12-year-old girl. The disposition was "indicated," which apparently is the equivalent of "inconclusive" in California CPS reports.

5

In August 2014 father filed a motion requesting presumed father status and, in a pretrial statement filed simultaneously, claimed he was entitled to custody of the minors.

An August 2014 addendum report stated that D.D. was "terrified" when he spoke to father on the telephone, and afterward he would cry and have nightmares. The one time A.D. agreed to talk to father on the phone, she was "shaking." However, D.D. said that if father came to Sacramento, D.D. would like to visit him and "would give him a big hug." A.D. said she did not want to visit with father. The minors' caregiver consistently stated that both minors resisted speaking with father and appeared to fear seeing him.

The report opined that it would be harmful to place the minors with father before they had built a trusting relationship with him. At a contested disposition hearing on August 26, 2014, father testified as follows:

He and mother lived together from 2005 to 2012. He tried to contact the minors after he and mother separated, but she was always too busy. It was three or four months before he found out from a cousin where mother and the minors had gone. (On cross-examination, father admitted he had done nothing to try to find them and had not sought a custody order.)

Once he had located mother and the minors, he had contact with the minors once or twice a week at mother's residence until she moved to California with them without giving him information about where they had gone. After that, he had contact with her twice a month and occasionally with the minors. On cross-examination, he admitted that he did not go to California or attempt to get more regular visitation with the minors; however, during redirect he claimed mother had never tried to work with him to make that happen.

Mother brought the minors to Ohio for two Christmas visits; father saw them for four or five hours the last time. That visit had gone well; the minors showed no fear of him. However, since then he had not spoken to them, even by phone. The day before the

6

hearing he had had his first visit with them since Christmas; they smiled and hugged him and showed no reluctance to see him.

Father denied any physical altercations with mother. He also denied that she had ever accused him of domestic violence. He admitted that D.D. had described domestic violence between the parents but claimed mother's real abuser was an earlier boyfriend.

Father sustained two DUI (driving under the influence) convictions in 2012, a month or two apart; he was granted two years' probation, which was now completed. He was allowed to drive to and from work only. His concealed weapon case also arose in 2012, leading to a conviction in 2013 and six months in jail.

Father saw alcohol as his only substance abuse problem. He had taken his last drink in April 2013. However, he had tested positive for Percocet in June 2014 (two months before the present hearing), which was a probation violation. As a probation requirement for his DUI offenses he had attended an AOD program. After he completed his sentence for carrying a concealed weapon, he was ordered into another AOD program and had been five weeks into it when his work schedule began to interfere. As a result, he was scheduled to begin a new AOD program in about a week.

Father had learned in his AOD program that alcohol causes "[b]lurred vision. Slurred. It controls you." Asked about the effect of a parent's drinking on his or her children, father said: "Just through different personality, I guess. Acting different." Asked to explain himself further, father said: "I wouldn't. I can't. I don't know." The only bad effect drinking had on him personally was blurred vision, and only if he had "a lot" to drink.

Father's family, who were also his support system, all lived in Ohio. Father lived with his parents. The paternal grandmother drank three or four beers a night, which could be a problem; however, she had never received help for that and he had never asked her to do so.

7

Father did not believe he had an anger problem. He admitted he formerly had a drug problem. His use of Percocet started with a prescription for a shoulder separation while he was in jail; the injury was a result of falling downhill while running from the police. He testified that he now used Percocet without a prescription. He was aware that it contains oxycodone.

Father acknowledged that using methamphetamine or pills around children could endanger them. However, using marijuana would not have that effect; there was a "[b]ig difference" between marijuana and methamphetamine. Father admitted that when he and mother were together, they jointly smoked marijuana and took prescription medications without prescriptions.

Father admitted he had never participated in any program (AA, substance abuse, parenting, or anger management) without a court order.

At a disposition/paternity hearing in September 2014 the juvenile court found that father was the minors' presumed father. Disposition was continued pending receipt of an expedited Interstate Compact for Placement of Children (ICPC) report from Ohio.

An October 2014 addendum report stated that father had been referred to services and drug testing, but as of July 9, 2014, there was no evidence he had participated. A kinship supervisor from Ohio reported outstanding concerns about father: he appeared unwilling to participate in services, and his CPS history needed further investigation.

A December 2014 addendum report informed the juvenile court that the ICPC report was received on November 5, 2014. It approved placement of the minors with father, *on condition that he complete a court-approved case plan.* Since the Department had already stipulated that father should receive services with the goal of placement, this recommendation did not change anything, in the Department's view.

The addendum stated: "[T]he report also noted a number of concerns related to the children and the family which may impact placement. Firstly, the report noted that [father] has an indicated sexual abuse on record for a twelve year old female from 2004.

8

The only details provided regarding this matter is [*sic*] that the child was a cousin of his girlfriend and she had been digitally penetrated and she manually masturbated [father] while both were intoxicated.  [Father] refused to give any details and directed the author of the home study report to contact his attorney for further information.  Secondly, [father] is on probation until 2015 and has a suspended driver's license.  However, [father] reports that he is allowed to drive to and from work.  Thirdly, *[father] tested positive for cocaine in September of 2014 during a routine probation drug and alcohol screenin*g.  The author of the home study did not note any sanction by the Probation Department regarding the positive test.  Lastly, the maternal [*sic*; paternal] grandmother and step grandfather reside in the home and would be provid[ing] child care for the children.  The author of the home study notes that she is uncertain how [father] would care for the children if he was on his own.  Given these concerns, the Department is recommending that the father complete the goals of his case plan prior to placement of the children."  (Italics added.)

The ICPC report, filed in the juvenile court on December 10, 2014, came with a cover letter dated October 27, 2014, signed by a Franklin County, Ohio, Children Services home study assessor and her supervisor.  The letter stated:  "[T]he home study is [a]pproved at this time.

"Points of consideration for the placement include:

"• [Father] will be provided with a copy of caseplan [*sic*] to complete identified goals.

"• [Father] will remain in compliance with probation and the courts."[2]

---

[2]  This awkwardly worded passage creates confusion about whether father is recommended for placement *before* completing his case plan.  The wording in the report itself (under "Agency Recommendations"), quoted below, is clearer and is consistent with the Department's opinion that father should receive placement only after doing so.

The home study included the following points: Father lived with his mother and stepfather. He denied any CPS history. As to the report of sexual abuse in 2004, father at that time declined an interview through his attorney. He now believed the case had been dismissed and alleged that the purported victim was "a troubled youth." Father is on probation until November 15, 2015; he claimed he regularly tested for drugs through probation and was in compliance. He claimed he did not currently take medications. The family home appeared suitable in all respects. The paternal grandmother would provide alternative child care if needed.

Under the heading "Issues/Concerns related to other child(ren) or adult(s) in the family that may impact placement," the report mentioned those cited in the Department's addendum. The report stated that despite father's positive test for cocaine in September 2014, he "is currently in good standing with probation" and "is not currently at risk for violation."

Under the heading "Agency Recommendations," the report stated: "Based on all known and available information, placement of this child [*sic*], in the home of this . . . caregiver[,] *this home study is approved on the condition that* [*father*] *is provided with a case plan and completes his case plan goals*." (Italics added.)

At the continued dispositional hearing on December 17, 2014, mother's counsel and minors' counsel joined the Department's counsel in opposing immediate placement of the minors with father. The juvenile court ruled as follows:

"As to the issue of disposition, having had the opportunity to review the ICPC and review the testimony that was provided, certainly, I think it was clear after the Court received the testimony that [father] initially made a fairly decent impression upon the Court.

"Unfortunately, the ICPC provides information to the Court that is inconsistent with some of the testimony that he provided. Probably most concerning is the positive test for cocaine in September. This was following his trial testimony where he was very

10

clear that he had been engaging in services to address substance abuse issues. What was notable about his testimony from the trial -- said he was able to tell the Court that he was learning about alcohol and how it affected him, how it controlled him, how it affected his children, and that children all have different personalities, so it impacts them different[ly]. But despite questions . . . at the time, he wasn't able to explain how it impacted his kids. He was just able to use the phrase it impacted his children, and that it affected him by controlling him.

"And I made note that he was able to use the buzz words, but not really able to demonstrate any real level of understanding given that then he has a positive test in September, and I have absolutely no explanation or further information about how all of [a] sudden it is that the man who is using Percocet in May and June and has multiple DUIs is now using cocaine in September, despite the fact that he also testified that he was going to be engaging in, yet, another class to address issues of the alcohol abuse which is going to be kind of a higher level class or more intense class. At least that was the impression I was going to be left with.

"I also have to consider the relationship that currently exists with his children. It's a very minimal relationship that exists between [father] and these children. And, in part, that is of his own choice. So I think that the Department has provided the Court with sufficient evidence to make the finding under 361.2 by clear and convincing evidence that it would be detrimental to the children, to their safety, protection, and physical and emotional well-being if they were to be placed with [father] at this time.

"Certainly, the prior report [about alleged sexual abuse] is concerning. I would also agree with that alone may not be enough to keep the children out of his home. But, again, it appears that the ICPC worker attempted to engage [father] on that issue, and he was not willing to converse with the social worker who was conducting the evaluation. So for these reasons, the Court at this time is going to adopt the findings [of the jurisdiction/disposition report]."

11

The juvenile court thereafter entered a written order denying placement of the minors with father on the basis that, by clear and convincing evidence, such placement would be detrimental to the minors' safety, protection, or physical or emotional well-being. The court also noted that father's progress in programs and services to date was "minimal."

## DISCUSSION

Father contends the juvenile court erred by finding clear and convincing evidence that placement of the minors with him would be detrimental to them. We disagree.

When a child is removed from parental custody, the juvenile court must "determine whether there is a noncustodial parent that desires to assume custody of the child." (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 59; cf. § 361.2, subd. (a).) "If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) That finding must be made by clear and convincing evidence. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827-1829.)

The juvenile court must weigh all relevant factors in determining detriment under section 361.2, subdivision (a). (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425-1426 (*Luke M.*).) In doing so, the court has "broad discretion to evaluate not only the child's physical safety but also his or her emotional well-being. In an appropriate case, all that might be required is a finding such a placement would impair the emotional security of the child." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1490.)

On appeal, we review the record in the light most favorable to the order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that the child would suffer detriment. (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*); *In re John M.* (2006) 141 Cal.App.4th 1564, 1569 (*John M.*); *Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.)

12

"Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt. [Citation.]" (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1262.) Applying that standard of review, we find substantial evidence to support the order.

First, substantial evidence supported the juvenile court's finding that father denied or minimized his polysubstance abuse problem, which could have caused great detriment to the minors had they been placed with him. Despite his claim that he had no problem with any drug other than alcohol, he tested positive for cocaine (a drug not previously identified as a preference) in September 2014—*after* the disposition hearing at which he admitted a positive test for Percocet *and while he was still on probation*. Furthermore, even as to the alcohol problem father admitted, his testimony made clear that he had learned little from his multiple AOD programs: he could not get beyond "buzz words" to show that he understood the effects of a parent's alcohol abuse on his or her children, and despite repeated DUI convictions he denied that alcohol had any effect on him other than "blurred vision" and slurring his speech. In addition, he saw nothing wrong with using the paternal grandmother as an alternative caretaker for the minors, despite her habit of drinking three or four beers per night, which he admitted could be a problem. In its totality, this evidence left no doubt that father had not grasped the dangers of substance abuse (his own or the paternal grandmother's) to the minors or made any serious attempt to deal with those dangers.

In determining "substantial physical danger" to a minor for purposes of section 300, subdivision (b), "the finding of substance abuse is prima facie evidence of the inability of a parent . . . to provide regular care resulting in a substantial risk of physical harm." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766-767 (*Drake M.*)) In determining detriment to a minor under section 361.2, which can consist not only of risk of physical harm but also risk of harm to the minor's emotional well-being, evidence that a parent's substance abuse has led to repeated criminal convictions and repeated positive

13

drug tests while on probation, that the parent continues to deny or minimize the problem, and that the parent shows no sign of having benefited from repeated AOD programs is a strong indication that the minor would incur detriment from being placed with the parent. (See *Drake M.*, at pp. 767-768.) That finding alone justified the denial of placement with father.

Father asserts to the contrary that courts have found "there must be some nexus between parental drug use and harm to the children" and no such nexus was shown here. However, father draws this "nexus" test from jurisdiction cases, where the juvenile court must find that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, *as a result of* the failure or inability of his or her parent or guardian to adequately supervise or protect the child[.]" (§ 300, subd. (b), italics added; see *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 724-725; *Drake M.*, *supra*, 211 Cal.App.4th at p. 757; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1002; *In re David M.* (2005) 134 Cal.App.4th 822, 828-829; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 825-826 (*Rocco M.*).)

The question under section 300 "is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.) Assuming drug use is one of the circumstances, a court may not assert jurisdiction based simply on a finding that a parent uses drugs, absent evidence that the drug use has created the risk of harm described in the statute. Indeed, in the cases cited by father, the evidence was to the contrary: the parent functioned well and the children were thriving though the parent abused drugs; the county could not demonstrate the children were at risk.

The facts and issues discussed in those cases do not resemble those involved in the present case, where the central issue is whether placement with father "would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) The evidence does not paint father as an involved parent who has

14

demonstrated the ability to parent notwithstanding his polysubstance abuse. Indeed, as the juvenile court noted, father's relationship with the minors could properly be called "minimal," and his own conduct, both before and after his separation from mother, was a major reason for the marginal relationship. His well-attested domestic violence with mother, which he continued to deny, terrified both minors. A.D. was so frightened of him that as of August 2014, shortly before the disposition hearing began, she did not even want to speak to him on the telephone. D.D. cried and had nightmares after speaking to father; he also expressed the wish that father would be nicer to mother. Father had barely seen the minors in the last two years and had made little visible effort to obtain more visitation before these proceedings began. So far as he claimed otherwise, the court evidently found his uncorroborated testimony not credible, and we do not reweigh the court's factual findings when performing substantial evidence review. Although he did more to contact and visit the minors after the proceedings began, he produced no evidence other than his own testimony to show that relations had improved significantly.[3]

We acknowledge that "an alleged lack of a relationship between father and the children is not, *by itself*, sufficient to support a finding of detriment for purposes of section 361.2, subdivision (a)." (*In re Abram L.* (2013) 219 Cal.App.4th 452, 464 (*Abram L.*), citing *John M.*, *supra*, 141 Cal.App.4th at p. 1570, italics added.) Here, however, as we have already stated, there was more: father's ongoing substance abuse and unacknowledged domestic violence history, which together largely explained the

---

[3] Father asserts: "[B]y November of 2014, both children reported to the caseworker that they wanted to live with [father]." However, father does not support this assertion by citing a statement by the minors or the caseworker. Father cites only an unsworn double hearsay assertion by the minors' counsel, which is not evidence. Moreover, counsel was referring to a purported ICPC recommendation that neither counsel nor the juvenile court had yet seen. As noted, *ante*, after all counsel had had the chance to review the report, the minors' counsel joined the Department's counsel and mother's counsel in opposing immediate placement with father.

lack of a relationship between father and the minors and the fear they expressed toward him as late as August 2014.[4]

Finally, although compliance with the ICPC is not required before placing minors with a noncustodial parent who lives out of state (*In re Z.K.* (2011) 201 Cal.App.4th 51, 66; *Patrick S.*, *supra*, 218 Cal.App.4th at p. 1263; *John M.*, *supra*, 141 Cal.App.4th at pp. 1572-1573), the juvenile court could properly note the concerns that stemmed from the ICPC report in this case, including father's positive cocaine test in September 2014, as among the relevant factors informing the court's exercise of discretion. (*John M.*, *supra*, 141 Cal.App.4th at p. 1572; see *Luke M.*, *supra*, 107 Cal.App.4th at pp. 1425-1426.) And although the court did not expressly cite the ICPC's recommendation, we note that, like the Department, the ICPC stipulated father should complete his case plan before taking custody of the minors. Given the court's finding that father's progress in completing his case plan to date was minimal, the ICPC's recommendation was yet another basis for refusing to give father immediate custody of the minors.[5]

Father asserts the juvenile court should have considered the minors' best interests because that is a necessary consideration in every juvenile dependency hearing. However, a court need not recite any particular talismanic language to prove that it has considered the minors' best interests. We think it evident that the court did so.

Father asserts the minors expressed the wish to be with father. However, nothing in the juvenile court's disposition prevents the minors and father from reunifying. On the

---

[4] Contrary to father's assertion, the juvenile court did not disregard "clear case law" on this issue. The cases father relies on do not hold that courts may not use the lack of a relationship between parent and children as "one of the evidentiary bases for its finding of detriment," but only that it cannot be the sole basis for that finding. Here, it was not.

[5] Father asserts that the ICPC's discussion of prior CPS involvement was not enough to justify denying placement. Since the juvenile court found expressly that it would not be enough, standing alone, we need not discuss this argument.

contrary, reunification is the goal, provided father completes his case plan. In the meantime, as father recognizes, children in dependency cannot decide where they are to be placed, even if much older than the minors in this case. (*Abram L.*, *supra*, 219 Cal.App.4th at p. 464; *John M.*, *supra*, 141 Cal.App.4th at p. 1570.)

Father asserts the minors would have benefited from close contact with their extended family. While that may be so, nothing in the disposition here precludes such contact.

In short, father has not shown any grounds for setting aside the dispositional orders.

## DISPOSITION

The dispositional orders are affirmed.

                                       RAYE            , P. J.

We concur:

         HULL           , J.

         ROBIE         , J.